# ATLANTIC COAST LINE RAILROAD COMPANY v. CITY OF GOLDSBORO, NORTH CAROLINA.

## ERROR TO THE SUPREME COURT OF THE STATE OF NORTH CAROLINA.

No. 112. Argued December 10, 1913.—Decided February 24, 1914.

Whether a municipal ordinance is within the power conferred by the legislature upon the municipality is a question of state law.

A municipal ordinance within the power delegated by the legislature is a state law within the meaning of the Federal Constitution.

Any enactment, from whatever source originating, to which a State gives the force of law is a statute of the State within the pertinent clause of § 237, Judicial Code, conferring jurisdiction on this court.

A railroad charter may embody a contract within the protection of the Federal Constitution.

Although the state court may have held that there was a contract, but that it was subject to constitutional reserved power to alter and repeal, this court, in reviewing that judgment under § 237, Judicial Code, will determine for itself the existence or non-existence of the asserted contract and whether its obligation has been impaired.

While a railroad company which devotes a part of its right of way to public use inconsistent with railway purposes may not lose its property right therein, the State may in the exercise of its police power and for the protection of the public so using such property, require the company to so use its other property as not to endanger the public, applying the principle underlying the maxim *sic utere tuo ut alienum non lædas.*

Neither the "contract clause" nor the "due process clause" of the Federal Constitution overrides the power of the State to establish · necessary and reasonable regulations under its police power, a power which can neither be abdicated nor bargained away and subject to which all property rights are held. ·

The enforcement of uncompensated obedience to a properly enacted police regulation for public health and safety is not an unconstitutional taking of property without compensation or without due process of law.

The constitutional validity of ordinances affecting public safety as affected by railroads must be considered not only in view of charter

and property rights but also of the consent and acquiescence of the owners of railroads.

Ordinances limiting speed of trains; requiring notice of their approach, fixing hours for shifting cars and periods of stoppage of cars, and requiring the adjustment of tracks to the established grade of the streets, in business sections of the municipality, are properly within the police power of the municipality, and when fairly designed to promote the public health and safety do not violate the contract clause or due process clause of the Federal Constitution.

Ordinances of the City of Goldsboro, North Carolina, regulating speed of trains, notice of their approach, periods for car shifting and length of time of car stoppages and requiring adjustment of grades of tracks to grades of streets in business section of the town, *held* proper and reasonably suited to the purposes they are intended to accomplish and therefore that they do not impair the obligation of the charter of a railroad occupying those streets, nor do they take any of its property without due process of law.

155 Nor. Car. 356, affirmed.

THE facts, which involve the constitutionality of a municipal ordinance regulating the operation of railroad trains and the standing of the cars in the street and requiring the tracks to conform to the street grade and to be filled in between the rails, are stated in the opinion.

*Mr. Frederic D. McKenney,* with whom *Mr. George B. Elliott* and *Mr. George M. Rose* were on the brief, for plaintiff in error:

The right of way of plaintiff in error is not a street. *Donahue* v. *State,* 112 N. Y. 142; *East Ala. Ry. Co.* v. *John Doe,* 114 U. S. 340; *Ga. R. & B. Co.* v. *Union Point,* 47 S. E. Rep. 183; *Muse* v. *Railroad,* 140 Nor. Car. 443; *Nor. Pac. Ry. Co.* v. *Townsend,* 190 U. S. 267; *Olive* v. *Railroad,* 142 Nor. Car. 257; Rev. Code Nor. Car., c. 65, § 23; *McLucas* v. *St. Jo. &c. R. Co.,* 93 N. W. Rep. 928; *Poulon* v. *A. C. L. R. R. Co.,* 51 S. E. Rep. 657.

The city of Goldsboro has not power to prevent the use of the franchise and property of the plaintiff in error, by ordinance. *A., T. & S. F. Ry. Co.* v. *Armstrong,* 80 Pac.

Rep. 978; *B. & P. R. R.* v. *Baptist Church,* 108 U. S. 317; *Chicago &c. Ry. Co.* v. *Joliet,* 79 Illinois, 25; *Drake* v. *R. R.,* 7 Barb. 508; *Morgan* v. *R. R.,* 98 Nor. Car. 247; *Moses* v. *R. R.,* 21 Illinois, 516; *New Orleans* v. *L'enfant,* 126·Louisiana, No. 17,995; *Railroad* v. *Applegate,* 8 Dana, 289; *Railway Co.* v. *Brand,* 4 Eng. & Ir. App. 171–196; *Taylor* v. *R. R.,* 145 Nor. Car. 400; *Thomasson* v. *R. R.,* 142 Nor. Car. 318; *Yates* v. *Milwaukee,* 10 Wall. 498.

This ordinance effects a taking of plaintiff's property and franchise without due process of law, and impairs the obligation of its contract with the State and the plaintiff in error is entitled to equitable relief. *Atlanta* v. *Gate City Gas Co.,* 71 Georgia, 106; *Broadway States Co.* v. *American Soc'y,* 15 Abb. Pr. (N. S.) 51; *Cleveland* v. *City Ry. Co.,* 194 U. S. 517; *Dobbins* v. *Los Angeles,* 195 U. S. 223; *Ex parte Young,* 209 U. S. 123; *Ga. R. & B. Co.* v. *Atlanta,* 118 Georgia, 486; *Mobile* v. *L. & N. Ry. Co.,* 84 Alabama, 115; *Paulk* v. *Syracuse,* 104 Georgia, 24; *Prentiss* v. *Atlantic Coast Line,* 214 U. S. 226; *Railroad* v. *Asheville,* 109 Nor. Car. 688; *Railroad* v. *Dunbar,* 97 Illinois, 571; *Rushville* v. *Gas Co.,* 132 Indiana, 575; *Smythe* v. *Ames,* 169 U. S. 466; *Sou. Ex. Co.* v. *Ensley,* 116 Fed. Rep. 756; *Water Works Co.* v. *Vicksburg,* 185 U. S. 65.

*Mr. Robert W. Winston,* with whom *Mr. J. Crawford Biggs, Mr. D. C. Humphrey, Mr. J. D. Langston* and *Mr. M. H. Allen* were on the brief, for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

The Atlantic Coast Line Railroad Company, plaintiff in error, has succeeded to the ownership of the property, franchises, and rights of the Wilmington & Raleigh Railroad Company, which was chartered by the General Assembly of North Carolina in the year 1833, and whose name was

afterwards changed to Wilmington & Weldon Railroad Company. Under its charter powers the original company constructed its railroad from Wilmington to and into Wayne County, North Carolina, passing through the place which later, and in the year 1847, became incorporated as the Town of Goldsboro, now the City of Goldsboro, defendant in error.

For the purposes of its railroad, the Wilmington & Raleigh Company acquired a strip of land 130 feet wide extending through Goldsboro from north to south, and constructed its road upon it before the incorporation of the town. The land was acquired in part under deeds conveying title in fee simple, in part by condemnation proceedings which conferred upon the Company, as is claimed, the equivalent of a fee simple. Afterwards, two other companies, designated respectively as the North Carolina Railroad Company and the Atlantic & North Carolina Railroad Company, with the consent and permission of the Wilmington & Raleigh, or Wilmington & Weldon, and under agreements with that company, constructed their railroad tracks upon the same "right of way."

The town naturally grew along the railroad, and the right of way, so far as not occupied by the tracks, was and still is used for the ordinary purposes of a street, without objection by plaintiff in error or its predecessors in title. In laying out the town, this right of way was designated as a street 130 feet wide; the portion lying east of the tracks being designated as East Center Street, the portion on the west of the tracks as West Center Street. Cross streets were laid out, designated successively (commencing at the north) as Holly, Beech, Vine, Oak, Ash, Mulberry, Walnut, Chestnut, Spruce, Pine, and Elm Streets. East and West Center Streets have become the principal business street of the town, and the portion between Ash and Spruce—four blocks—is the heart of the city.

During the years since the incorporation of Goldsboro numerous industries have been and are now located on East and West Center Streets, and the track of plaintiff in error, in addition to its use as a part of the main line, has been and is used by the Company in shifting cars into and out of these industries, and also for reaching the freight terminals of the other two railroads, which are in the northerly part of the town; the terminal of plaintiff in error being in the southerly part. A belt line has been built around the city, over which through passenger trains and some freight trains are moved, but the use of the old main line for connecting with the other terminals, for shifting cars into industries and loading tracks along the right of way, and for the passage of certain of its trains, is claimed by plaintiff in error to be still essential to its business.

The municipal corporation has for many years worked and maintained its streets and cross streets, including so much of the surface of East and West Center Streets as lies outside of the space actually occupied by the railroad tracks. More recently it has instituted a system of street grades and of drainage extending throughout the city, and has paved a considerable part of East and West Center Streets in conformity to the grade so established. From Chestnut Street north the railroad tracks are (or, at least, prior to the municipal action complained of they were), from 6 to 18 inches above the established street grade; the tracks south of Chestnut Street being in a cut from 1 to 8 feet deep.

In November, 1909, the Board of Aldermen passed an ordinance or ordinances containing the following provisions: Section 1 rendered it unlawful for any railroad company to run any freight or passenger train on East or West Center Streets at a rate of speed exceeding four miles per hour, and required the companies to have flagmen proceed fifty feet in front of every train to warn persons of its approach. Section 2 provided that the shifting

limits on East and West Center Streets should be from Spruce Street to the city limits on the south, and from Ash Street to the city limits on the north; thus excluding the four blocks between Spruce and Ash Streets. Section 3 declared it to be unlawful for any railroad company to do any shifting within those four blocks at any other time than between the hours of 6.30 and 8.30 a. m., and between 4.30 and 6.30 p. m. Section 4 rendered it unlawful for any railroad company to place any car and allow it to stand for a longer period than five minutes at any point on East and West Center Streets within the same four blocks. Section 5 required all railroad companies owning tracks on East and West Center Streets between Walnut and Vine (four blocks) to lower the tracks so as to make them conform to the grade line of the streets, and to fill in the tracks between the rails; the required lowering being specified as 6 inches from Walnut to Mulberry, 10 inches between Mulberry and Ash, and 18 inches between Ash and Vine Streets. Substantial penalties were prescribed for violations of these prohibitions.

Plaintiff in error began this action against the City of Goldsboro in the Superior Court of Wayne County, seeking to restrain the enforcement of the ordinances. A temporary restraining order was granted. At the hearing, the objection to the enforcement of § 1 was abandoned by plaintiff; as to the other sections the court vacated the restraining order. Upon appeal, the Supreme Court of North Carolina affirmed the judgment. 155 Nor. Car. 356. The present writ of error under § 709, Rev. Stat. (Judicial Code, § 237), is based upon the insistence, made in the state courts and there overruled, that the ordinances impair the obligation of the contract contained in the charter of the Company, in contravention of § 10 of Art. I of the Federal Constitution, and deprive the Company of its property without due process of law, in contravention of the Fourteenth Amendment.

The Supreme Court of the State construed the section forbidding shifting as having reference to the "cutting out and putting in" of cars in the making up of a train before it is dispatched upon its journey, and not as referring to the "transfer" of a train of cars, already made up by plaintiff in error, to another railroad company for transportation. In view of the fact that plaintiff in error has shifting yards farther from the center of the city, where its trains can be made up and at least the chief part of the necessary shifting done, the court held it to be a reasonable exercise of the police power to forbid car shifting, except within the limited hours specified, on the four blocks of the plaintiff's track that lie in the heart of the city; declaring this regulation to be necessary for the convenience and safety of the public at the crossings.

With reference to the section requiring the lowering of the tracks between Walnut and Vine Streets so as to make them conform to the grade lines of the streets, the court held that the Company took its charter subject to the right of the State to lay out new roads and streets and to require the Company to make such alterations as would prevent the public passage over its tracks from being impeded; and that there was no contract exempting the Railroad from changing its grade at crossings when required.

In this court, plaintiff in error abandons its attack upon the right of the City to require a change of grade at the street crossings. The controversy, therefore, is now limited to (a) the restrictions imposed by §§ 2 and 3 upon shifting operations on East and West Center Streets between Spruce and Ash Streets; (b) the prohibition of § 4 against the standing of cars for a longer period than five minutes within the same four blocks, and (c) the requirement under § 5 that the tracks from Walnut to Vine Streets shall conform to the grade of East and West Center Streets and shall be filled in between the rails, elsewhere

than at the crossing streets. Upon the argument, it was stated by counsel representing the City that plaintiff in error had complied with the decision of the state court as to § 5, at least to the extent of lowering its tracks. But there was no clear admission of the fact in behalf of plaintiff in error, and we shall therefore disregard the supposed compliance.

It is among other things contended by plaintiff in error that the ordinances are not within the powers conferred by the Legislature of North Carolina upon the municipal corporation. This is a question of state law, which for present purposes is conclusively settled by the decision of the Supreme Court of North Carolina in this case. *Merchants' Bank* v. *Pennsylvania*, 167 U. S. 461, 462, and cases cited; *Lombard* v. *West Chicago Park Com.*, 181 U. S. 33, 43.

A municipal by-law or ordinance, enacted by virtue of power for that purpose delegated by the legislature of the State, is a state law within the meaning of the Federal Constitution. *New Orleans Water Works* v. *Louisiana Sugar Co.*, 125 U. S. 18, 31; *Hamilton Gas Light Co.* v. *Hamilton City*, 146 U. S. 258, 266; *St. Paul Gas Light Co.* v. *St. Paul*, 181 U. S. 142, 148; *Northern Pacific Railway* v. *Duluth*, 208 U. S. 583, 590; *Grand Trunk Ry.* v. *Indiana R. R. Comm.*, 221 U. S. 400, 403; *Ross* v. *Oregon*, 227 U. S. 150, 162.

And any enactment, from whatever source originating, to which a State gives the force of law, is a statute of the State, within the meaning of the pertinent clause of § 709, Rev. Stat.; Judicial Code, § 237; which confers jurisdiction on this court. *Williams* v. *Bruffy*, 96 U. S. 176, 183.

We must, therefore, treat the ordinances as legislation enacted by virtue of the law-making power of the State. They are manifestly an exertion of the police power, and the question is whether, viewed in that light, they run counter to the "contract" or "due process" clauses.

That a railroad charter may embody a contract, within the meaning of the Constitution, hardly needs to be stated. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. In the present case the Supreme Court of North Carolina held that by the constitution of the State, the charter was subject to alteration or repeal at the legislative will. If the right of repeal was indeed thus reserved, the result is obvious. *Greenwood* v. *Freight Co.*, 105 U. S. 13, 21; *Knoxville Water Co.* v. *Knoxville*, 189 U. S. 434, 437. But when this court has under review the judgment of a state court by virtue of § 709, Rev. Stat., and the validity of a state law is challenged on the ground that it impairs the obligation of a contract, this court must determine for itself the existence or non-existence of the asserted contract, and whether its obligation has been impaired. *Douglas* v. *Kentucky*, 168 U. S. 488, 502; *Stearns* v. *Minnesota*, 179 U. S. 223, 233. We are not referred to and are unable to find, in the state constitution as it existed when the charter now in question was granted, any reservation of the right of repeal, and will assume for present purposes that the contract was not thus qualified, and deal only with the question whether it has been impaired.

Plaintiff in error lays more particular stress upon the insistence that its property rights in the street will be infringed by the enforcement of the ordinances. Because its predecessors acquired the strip of land in fee simple, and because the municipal corporation has never condemned it or made compensation for its use as a street, the contention is that the title of the railroad company remains until now, absolute and unqualified. Reference is made to Rev. Code of Nor. Car., c. 65, § 23. This section, it seems, became law in North Carolina in the year 1854; and has remained upon the statute books continuously until the present time, appearing now as § 388 of the Revisal of 1908; see also Code 1883, § 150. It provides that "No railroad, plank road, turnpike or canal company

shall be barred of, or presumed to have conveyed, any real estate, right of way, easement, leasehold, or other interest in the soil which may have been condemned, or otherwise obtained for its use, as a right of way, depot, station-house or place of landing, by any statute of limitation or by occupation of the same by any person whatever." Two cases, *Railroad* v. *Olive*, 142 Nor. Car. 257, 271, and *Muse* v. *Railroad*, 149 Nor. Car. 443, 446, are cited as supporting the proposition that under this statute a permissive user of any portion of the railroad right of way by others, or even by the public as a street, cannot impair the title of the company unless at least there be adverse user or possession for a sufficient period to satisfy the statutes on that subject; and it is insisted there has been none. But in both cases the question was as to the effect of the permissive user or possession upon merely private rights, and in the *Muse Case* it was expressly conceded (149 Nor. Car. 446) that the rights of the railroad company in that portion of its right of way that had been used as a street, were subject to the police power of the town. In the present case, likewise, the state court (155 Nor. Car. 363) treated the question of the ownership of the soil as not involved in the decision.

And we are not at present particularly concerned with either contract or property rights, except as they may serve to show the conditions under which the ordinances were adopted, and may bear upon the question of the reasonableness of those regulations. These have to do with the use and control of the property, rather than with its ownership; with the mode in which the franchise shall be enjoyed, rather than with its scope. Conceding, for argument's sake only, the utmost that may be claimed as to the charter and property rights of plaintiff in error, we still have yielded nothing that may defeat the exercise of the police power by the State, or by its authorized agency. Adopting the extreme assumption that the rail-

road company has still a complete and unqualified ownership of every portion of the strip of land that was originally acquired in fee simple, and as proprietor might lawfully exercise its dominion by excluding the public from it; yet it does not do this, but permits, and long has permitted, the public to use material portions of the strip for ordinary street purposes; it apparently excludes the public from no portion except as the existence of the tracks and the passage of trains may have such a tendency or effect. And thus the Company, at least for the time, devotes its property in part to public uses that are more or less inconsistent with the railroad uses, and under conditions such as to render the railroad operations necessarily a source of danger to the public while enjoying the permitted use. Under such circumstances the State, in the exercise of the police power, may legitimately extend the application of the principle that underlies the maxim *sic utere tuo ut alienum non lœdas,* so far as may be requisite for the protection of the public.

For it is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise. *Slaughter-House Cases,* 16 Wall. 36, 62; *Munn* v. *Illinois,* 94 U. S. 113, 125; *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 33; *Mugler* v. *Kansas,* 123 U. S. 623, 665; *Crowley* v. *Christensen,* 137 U. S. 86, 89; *New York &c. R. R. Co.* v. *Bristol,* 151 U. S. 556, 567; *Texas &c. R. R. Co.* v. *Miller,* 221 U. S. 408, 414, 415. And the enforcement of uncompensated obedience to a regulation established under this power for the public health or safety is not an unconstitutional taking of property without compensation or without

due process of law. *Chicago, Burlington &c. Railroad* v. *Chicago,* 166 U. S. 226, 255; *New Orleans Gas Co.* v. *Drainage Commissioners,* 197 U. S. 453, 462; *C., B. & Q. Ry.* v. *Drainage Commissioners,* 200 U. S. 561, 591, 592.

Of course, if it appear that the regulation under criticism is not in any way designed to promote the health, comfort, safety, or welfare of the community, or that the means employed have no real and substantial relation to the avowed or ostensible purpose, or that there is wanton or arbitrary interference with private rights, the question arises whether the law-making body has exceeded the legitimate bounds of the police power.

The ordinances now in question must be considered in view not only of the charter and property rights of plaintiff in error, but of the actual situation that has developed and now exists in Goldsboro, with the consent and long acquiescence of plaintiff in error and its predecessors in interest. A town of considerable size and importance has grown up along the line of the railroad. The strip of land 130 feet in width, so far as it is not occupied by the railroad tracks, for many years has been and still is used for the ordinary purposes of a street. The Supreme Court of North Carolina found, upon adequate evidence, that it is the main business street of the town, frequently crowded with pedestrians and vehicles; and that the operation of trains along it, notwithstanding the utmost care of the railroad company, tends to obstruct the crossings and is fraught with danger to life and property. There are, within the blocks covered by the ordinances, two main lines of railway besides that of plaintiff in error. These of course complicate the situation by narrowing the spaces available for ordinary travel north and south on East and West Center Streets, and must also enhance the dangers at the crossings.

It is very properly conceded that the company may be required to limit the speed of its trains and to have flag-

men precede them to warn persons of their approach; and that the company may be required to change its grade at the street crossings. In *New York &c. R. R. Co.* v. *Bristol,* 151 U. S. 556, 567, this court sustained a Connecticut statute directed to the extinction of grade crossings as a menace to public safety, and compelling this to be done at the expense of the companies, although the grade crossings had been long before established under legislative authority. In *Chicago, Burlington &c. R. R.* v. *Chicago,* 166 U. S. 226, 251, it was held that when the city opened a new street across the railroad it was not bound to take and pay for the fee in the land, but only to make compensation to the extent that the value of the company's right to use the land for railroad purposes was diminished by opening the street across it; and that the company was not entitled to have its compensation increased because of the fact that in order to safeguard the crossing it would thereafter be obliged to construct gates, and a tower for operating them, plank the crossing, fill in between the rails, and incur certain annual expenses for depreciation, maintenance, employment of gatemen, etc. To the same effect are *Wabash Railroad Co.* v. *Defiance,* 167 U. S. 88, 97; *Chicago &c. Railroad* v. *Nebraska,* 170 U. S. 57, 75; *Northern Pacific Ry.* v. *Duluth,* 208 U. S. 583, 597; *Cincinnati &c. Ry.* v. *Connersville,* 218 U. S. 336, 343; *Chicago, M. & St. P. Ry.* v. *Minneapolis,* decided this day, *ante,* p. 430. And see *Grand Trunk Western Ry.* v. *South Bend,* 227 U. S. 544, 554.

But manifestly the tracks cannot be brought to the street grade at the crossings without being lowered between the crossings as well. And if this is to be done, it follows that not merely the tracks but the surface adjacent to the tracks must be made to conform to the established grade of East and West Center Streets between the crossing streets; or else the street will be rendered materially less convenient for purposes of north-and-south travel,

and the drainage will be materially interfered with; or at least the municipal authorities might reasonably so determine. The establishment of a proper system of drainage for the City in the interest of the public health and general welfare is an object that legitimately invokes the exercise of the police power. *New Orleans Gas Co.* v. *Drainage Commission,* 197 U. S. 453, 460.

As to filling in between the rails, elsewhere than at the crossing streets, we have to do not merely with the necessities of drainage, but with the safety of persons crossing the railroad tracks midway of the respective street blocks. The power of the State to prescribe precautions with respect to the running of railroad trains so as to guard against injuries to the persons or property of others is not confined to the establishment of such precautions at highway crossings. State enactments requiring railroad corporations to maintain fences and cattle guards alongside the railroad have been repeatedly sustained. *Missouri Pacific Ry. Co.* v. *Humes,* 115 U. S. 512, 522; *Minneapolis Ry. Co.* v. *Beckwith,* 129 U. S. 26, 34; *Minneapolis & St. Louis Ry.* v. *Emmons,* 149 U. S. 364, 366. For the purposes of the argument it may be conceded that no person has the right as against the railroad company to pass over its tracks except at one of the street intersections; although this may not be entirely clear. But unless excluding fences be established adjacent to the railroad tracks (and this is not proposed nor even suggested as feasible), it is inevitable that many people, with or without right (children of tender years, among others), will cross at places other than the street intersections; and a police regulation intended to prevent injuries to persons thus crossing cannot be judicially denounced as arbitrary. Other grounds for sustaining § 5 might be mentioned; but we need not further particularize.

There remain only the limitation of car shifting and the prohibition of the standing of cars upon East and West

Center Streets in the four blocks that lie between Spruce and Ash Streets, in the heart of the City. As already pointed out, the state court construed "shifting" as applying only to the "cutting out and putting in" of cars in the making up of trains. This operation is not to be performed within the four blocks specified except during two hours in the morning and two hours in the afternoon of each day. The time limits were evidently adopted with regard to the necessities of the industries that are located along the railroad, and at the same time with a view to the necessities of general travel upon the streets. It was complained that the time allowed for shifting is inadequate; but there is nothing in the proof on this subject to overthrow the finding of the court that the ordinance is a reasonable exercise of the police power.

The prohibition against the standing of cars for a longer period than five minutes within the same four blocks is intended to prevent the loading and unloading of cars in the street, with the attendant use of wagons and drays for the purpose. In view of the obstruction to street travel that is naturally incident to such operations, the prohibition cannot be deemed wholly unreasonable. In effect it prevents ordinary travel upon the street from being thus obstructed, and requires that the loading and unloading of cars shall be done at the regular freight terminals.

The regulations in question are thus found to be fairly designed to promote the public health, safety, and welfare; the measures adopted appear to be reasonably suited to the purposes they are intended to accomplish; and we are unable to say that there is any unnecessary interference with the operations of the railroad, or with the property rights of plaintiff in error. Therefore, no violation of the "contract" or "due process" clause is shown.

*Judgment affirmed.*