## UNITED STATES v. AMERICAN BOND & MORTGAGE CO. et al.

District Court, N. D. Illinois, E. D. March 1, 1929.

No. 8704.

450

John G. Sargent, Atty. Gen., George E. Q. Johnson, U. S. Atty., of Chicago, Ill., William J. Donovan, Asst. to Atty. Gen., and Bethuel M. Webster, Jr., and Louis G. Caldwell, Sp. Assts. to Atty. Gen., and Allan Healy, Asst. U. S. Atty., of Chicago, Ill., for the United States.

Scott, Bancroft, Martin & MacLeish, of Chicago, Ill., for defendants.

WILKERSON, District Judge. The bill is for an injunction against radio broadcasting by the defendants without a federal license. It alleges that defendants who were refused a license by the Radio Commission threaten to operate a radio apparatus, for the transmission of energy in interstate and foreign commerce, in such a manner as to interfere with transmission and reception by others duly authorized thereto. Defendants answer and assert the invalidity of the Radio Act of 1927 (47 USCA § 81 et seq.) and the order of the commission refusing the license. The United States applies for a temporary injunction. The record consists of the pleadings, affidavits and proceedings before the commission.

In 1924, defendants constructed and commenced the operation of a station in Chicago under a license issued pursuant to the Radio Act of 1912 (47 USCA §§ 51–60). In 1927, in order to avoid interference with receiving sets in Chicago, defendants moved their station to Homewood, Ill., and consolidated with another station which was first licensed in 1925. The Homewood transmitter, operating under the call letters WMBB—WOK, was built during the months of August and September, 1927, under a construction permit issued by the commission. On Sept. 28, 1927, the commission issued a license to defendants authorizing them to operate the station for 60 days on a frequency of 1,190 kilocycles per second, and with a 5,000 watt power. This license was renewed from time to time for 60-day periods. On May 25, 1928, defendants were notified that after an examination of their application for renewal of license, the commission was not satisfied that public interest, convenience or necessity would be served by granting the application, that there would be a hearing on the application on July 9, 1928, and that unless defendants made an affirmative showing that public interest, convenience, or necessity would be served the application would be denied finally. After the hearing the application for renewal was denied and the license expired September 1, 1928.

If the statute relied on is a valid exercise of the regulatory power over interstate and foreign commerce granted by the Constitution, the right of the United States to invoke the remedy in equity here sought is clear. The bill is to redress wrongs which affect the public at large and are in respect of matters which, if interstate and foreign commerce are involved, are intrusted to the care of the nation and concerning which the nation owes the duty to all the citizens of securing them their common rights. The persons affected are numerous and widely separated and their injuries severally may be small. The interference complained of amounts to a public nuisance and is within the jurisdiction of equity because of the irreparable damage to individuals and the great public injury which are likely to ensue. That the acts of the defendants may be violations of the criminal law also does not destroy the jurisdiction of equity.

The Attorney General, by virtue of his office, may bring this proceeding, and no statute is necessary to authorize the suit. In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092; Sanitary District v. U. S., 266 U. S. 405, 425, 426, 45 S. Ct. 176, 69 L. Ed. 352; Heckman v. United States, 224 U. S. 413, 438, 442, 32 S. Ct. 424, 56 L. Ed. 820; United States v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 532; United States v. American Bell Telephone Co., 128 U. S. 315, 367, 9 S. Ct. 90, 32 L. Ed. 450; United States v. San Jacinto Tin Co., 125 U. S. 273, 285, 8 S. Ct. 850, 31 L. Ed. 747.

We come then to consider the nature of the subject-matter which Congress has sought to subject to regulation, the statutes enacted to that end and the proceedings before the commission resulting in refusal to renew the license of defendants.

Radio transmission is one of the great scientific achievements of all time. It has become one of the main factors in the life and civilization of the world. Its importance is increasing. The protection of the public in the enjoyment of its benefits is a most important function of government.

Radio waves travel in all directions for great distances into other states and foreign countries. One may turn the dial of the receiver and hear sounds resulting from energy transmitted from widely separated places in the United States, Canada, and other coun-

tries. More than one station can transmit at the same time in the same geographical region (the extent of which depends upon the power used) only because radio waves having sufficiently different frequencies (wave lengths) can be detected separately to the exclusion of other waves by receiving apparatus. In the present state of the art, a difference of 10 kilocycles is considered the smallest practical separation of frequencies. The frequencies or carrier waves thus separated are known as channels. There are 96 channels in the broadcast band set aside by the commission for use by broadcasting stations, extending from 550 to 1500 kilocycles (corresponding to wave lengths extending from 545.1 to 199.9 meters). A station transmits intelligibly for what may be called a service area, and causes interference with other stations operating on the same wave length in what may be called a nuisance area. A low-power station, even if it does not of itself transmit into other states, will cause interference with reception of other stations broadcasting on the same wave length into the state in which the low power station is located.

Radio, on account of its nature, early received national and international consideration. 24 Op. Attys. Gen. 1902, page 100; Treaty of Berlin, 37 Stat. 1565; Treaty of London, 38 Stat. 1672, 1707. The United States, to carry out the treaty provisions for avoiding interference, enacted the Radio Law of 1912. 37 Stat. 302 (47 USCA §§ 51–60). That act required licenses from the Secretary of Commerce for operation of all radio apparatus and made the licenses subject to the regulations contained in the act and all subsequent acts and treaties. The act was directed mainly to the problems then existing which had to do with radio telegraphy and not broadcasting, although the language was broad enough to include radio telephony.

As the number of radio stations increased, the courts found in the act limitations upon the authority of the government to deal adequately with questions of interference. Hoover v. Intercity Radio Co., 286 F. 1003, 52 App. D. C. 339; United States v. Zenith Radio Corporation (D. C.) 12 F.(2d) 614.

When the Attorney General ruled (35 Op. Attys. Gen. 126) that the act did not give the Secretary of Commerce authority to assign channels, fix hours of operation, limit use of power, or grant licenses of limited duration, there resulted a condition of general confusion. There was a scramble for preferred channels. The Secretary was required to issue licenses to all. Many new stations were built and assertions of property rights in wave lengths and the ether were made. On December 8, 1926, Congress passed a joint resolution limiting license periods and requiring waiver of claims to wave lengths or the use of the ether as a condition precedent to licenses. 44 Stat. 917.

On February 23, 1927, the Radio Act of 1927 was approved. 44 Stat. 1162 (47 USCA § 81 et seq.). It asserts government control over all channels of radio transmission, provides a license system for radio stations and prohibits radio transmission, under penalty, except with a license in that behalf granted under the provisions of the act. For the purposes of the act the United States is divided into five zones, Illinois being in the fourth. A Radio Commission is created whose duty it is, from time to time, as public convenience, interest, or necessity requires, to classify stations, regulate nature of service, assign wave lengths, regulate apparatus, prevent interference, establish station areas, and regulate chain broadcasting. Section 4, 44 Stat. 1163 (47 USCA § 84). By section 9 of the act (44 Stat. 1166) it is provided that the licensing authority, if public convenience, interest or necessity will be served, subject to the limitations of the act, shall grant licenses, and in so doing, when and in so far as there is demand for the same "shall make such a distribution of licenses, bands of frequency or wave lengths, periods of time for operation, and of power among the different states and communities as to give fair, efficient, and equitable radio service to each of the same." By amendment of March 28, 1928 (45 Stat. 373, § 3 [47 USCA § 89, note]), the term of licenses granted or renewed is limited to three months. The amendment provides more specifically for equality of radio service among the zones and requires that the licensing authority "shall as nearly as possible make and maintain an equal allocation of broadcasting" facilities to each of the zones and shall carry into effect the equality directed, "whenever necessary or proper, by granting or refusing licenses or renewals of licenses." 45 Stat. 373, § 5, amending section 9 of act 1927 (47 USCA § 89). Section 10 of the act states the requirements of applications for license. 44 Stat. 1166 (47 USCA § 90). In this connection it is to be noted that in an earlier section (section 5, 44 Stat. 1164 [47 USCA § 85]) it is provided that no station license shall be granted until the applicant therefor shall have signed a waiver of any claim to the use of any particular frequency or wave length or of the ether

as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise. Section 11 of the act provides that if the licensing authority shall determine that public interest, convenience, or necessity would be served by the granting of the license, it shall authorize the issuance, renewal or modification thereof in accordance with such finding; if not, it notifies the applicant of a hearing "under such rules and regulations" as it may prescribe. Each license is required to contain the statement that the license does not vest in the licensee any right to operate the station nor any right in the use of the frequencies or wave length designated in the license beyond the term thereof nor in any other manner than authorized therein. 44 Stat. 1167 (47 USCA § 91). Section 16 provides for appeal to the Court of Appeals of the District of Columbia from orders denying licenses or renewals and authorizes that Court to hear additional evidence and to alter or revise the judgment of the commission and to enter such judgment as to it may seem just: 44 Stat. 1169 (47 USCA § 96). Section 21 of the act provides for construction permits upon a finding of public convenience or necessity and for license to operate upon compliance with the provisions of the construction permit. 44 Stat. 1170 (47 USCA § 101).

The commission created by the act of 1927 proceeded with regulatory measures to bring order out of chaos and to stop what was rapidly becoming a general public nuisance. The problem of distributing the channels equitably among the different zones and working out a plan which would avoid interferences was one of great difficulty. It was obvious that such a plan must be devised and made effective or in the resulting confusion both broadcasters and receivers would lose everything. The commission adhered to the policy adopted by the Department of Commerce under the act of 1912 and adhered to by governments of European nations and nations elsewhere in the world with reference to the channels allocated for broadcasting purposes. There were 96 of those channels. Six were set aside for the exclusive use of Canadian broadcasting stations. Eleven were set aside for simultaneous or shared use by Canadian stations and stations located in the United States. The remaining waves were to be allocated among applicants in accordance with the provisions of the Radio Act.

The notice of May 25, 1928, to defendants was given pursuant to the commission's general order 32 by which many stations were required to show cause why their applications for renewals should not be refused. At the hearing which commenced July 9, 1928, the evidence on behalf of the stations covered by general order 32 was heard first. Defendants, first objecting on constitutional grounds to the hearing, submitted testimony and affidavits as to the equipment and operation of the station. They showed that its program consisted of entertainment, chiefly music and addresses of public interest. The programs, accompanied by announcements stating the names of the station and its operators, and, in some instances, the names of others who paid for programs, had the effect of advertising and developing the good will of defendants and such other persons. Defendants produced letters and telegrams from radio listeners in the United States and Canada commending the programs and the clarity of reception.

The commission produced evidence at the close of the evidence of the respondents to general order 32. This evidence, consisting of engineering testimony and exhibits, covered, among other things, the subject of interference, division of the United States into five zones, allocation of wave lengths and frequencies to each of the five zones and number, kind, location, frequency and power of stations in each zone. All of the applications for licenses filed in the fourth zone in which defendants' station was located were produced. There were 196 such applications which stated as to each station ownership, investment, equipment, geographical location, time of operation, frequency, power, service, programs, public service, operating expenses, interest in other stations, history of stations and reason why the granting of the application would be in the public interest.

It appears that in allocating wave lengths, the interference of one station with another must be taken into consideration. There are two principal types of interference. One is called "heterodyne" and manifests itself in the form of a disagreeable whistle of varying pitches which is reproduced by the receiving set. This results from interaction in the receiver of the carrier waves from two broadcasting stations operating on channels separated by too narrow a margin. Another type of interference is called "cross-talk" and manifests itself by the reproduction simultaneously of two or more programs at once in the receiver in such a way that neither one may be heard satisfactorily by persons listening to the receiver. A third type, which is

known as "blanketing," is really an exaggerated form of "cross-talk," and results in the program of one broadcasting station being completely blotted out by the program of another station.

In making allocations it is necessary to consider the "service area" and "nuisance area" of stations. The carrier wave travels far beyond the area in which the station can give good service to listeners into areas where it is still sufficiently strong to cause objectionable heterodyne interference with the broadcasting of other stations. In practice conditions. vary to such an extent that the service area and nuisance area can be defined only with approximate accuracy. A definition of the different types of areas under average conditions during evening hours is shown by the following table:

broadcasting stations. It recites that this is done ·in order to comply with the statutory mandate for equal allocation to the five zones in the manner hereinbefore mentioned. The order also recites that the allocations therein mentioned will promote public interest, convenience, and necessity in so far as the same can be done in a manner consistent with the requirements of the statute, and will greatly improve reception conditions in the broadcast band by elimination of a large portion of the existing interference. The order of the commission divides the 90 available channels into three classes. It takes 40 of those, which may be described as clear channels in which a high power station can be placed without obstruction, and divides those 40 among the five zones, allocating eight to each zone and giving that zone an absolute right to those

| Power of Station. | Radius of Area of Very Good Service (City Dweller). | Radius of Area of Good Service (Suburban Dweller). | Radius of Area of Fair Service (Rural Listener). | Radius of Nuisance Area. |
|---|---|---|---|---|
| 50 watts | 2 miles | 10 miles | 100 miles | 300 miles |
| 100 watts | 3 miles | 15 miles | 150 miles | 450 miles |
| 500 watts | 6 miles | 30 miles | 300 miles | 900 miles |
| 1,000 watts | 9 miles | 45 miles | 450 miles | 1,350 miles |
| 5,000 watts | 20 miles | 100 miles | 1,000 miles | 3,000 miles |
| 50,000 watts | 60 miles | 300 miles | 3,000 miles | Beyond limits of country |

It is apparent from the foregoing table that a station using a power of 5,000 watts (the power of defendants' station) will blanket the United States, and at times make it impossible for any other station to operate satisfactorily on the same channel. It is also apparent that the nuisance area of a station using power of 50 watts (the lowest for which a station is licensed) will almost certainly pass beyond the borders of the state in which the broadcasting station is located. This may cause interference within the state with radio waves coming into the state from other states; with broadcasting stations within the state whose service area extends beyond the state; with broadcasting stations in other states which are broadcasting across other state lines. The engineering showing demonstrates that unified public control is essential to secure to the owners of broadcasting stations an assured channel, which they may use without interference, and to secure to the listening public satisfactory reception of the programs broadcast on those channels.

After the hearing in question, the commission, on August 30, 1928, issued its general order 40. That order makes allocations to each of the five zones, of frequencies, time for operation, and station power for use by

eight channels. Among these clear channels is the particular channel here involved, 1,190 kilocycles. That channel has been assigned to the third zone, the South. It is a channel assigned after November 11, 1928, under order of the Commission to two Texas stations (Dallas and San Antonio) on a division of time. It is a clear channel for high power stations only, and if any other station goes on that channel it will cut down the area of service from about 500,000 square miles to 17,000 or 18,000 square miles, and the people of the third zone will have impaired reception.

General order 40 allocates, equally among the zones, frequencies to what may be called regional stations, in which there is a possibility of having two, three, or four stations in a channel, but not more than 1,000 watts in any particular case; other channels for local stations limited to 100-watt power; and other channels with even more limited power for very small local areas.

In harmony with the plan provided in general order 40, the commission, on August 31, 1928, denied the application of the defendants for a renewal of license. If defendants' station operates at 1,190 kilocycles, it will impair reception in the third zone to which the channel has been allocated, and

destroy the equality among the zones required by the statute. If it operates on any of the eight clear channels assigned to the fourth zone (of which Illinois is a part), or if it operates in any of the regional or local channels, it will interfere with transmission and reception on those channels. If it operates within the 10 kilocycles separation between the channels there will be similar interference.

Defendants attack the constitutionality of the Radio Act on the following grounds:

(1) The act is an unreasonable exercise of the power to regulate commerce and attempts to reach matters of private business which are not interstate commerce and which are not so related thereto that they may be regulated by Congress.

(2) The act is unreasonable and arbitrary as to the business of defendants, even if interstate and foreign commerce is involved, because (a) the standard prescribed will not effectually prevent and, in fact, requires, the exercise of arbitrary power by the administrative body; (b) the act places no limit upon the destruction of an established business in the exercise of the regulatory power and provides a confiscatory and destructive method of regulating a lawful occupation in violation of the Fifth Amendment.

(3) The act attempts an unlawful delegation of legislative power, because the standard set up in the act for the guidance of the administrative body is not sufficient.

It will be seen that these contentions, when analyzed, resolve themselves into an attack upon (1) the scope of the act as a proper regulation of interstate and foreign commerce; (2) the unconstitutional taking of private property which it is claimed the act permits and, in fact, requires; (3) the alleged arbitrary and indefinite character of the standard which the act prescribes.

It is apparent from the description of radio broadcasting which has been given heretofore that, if its benefits are to be enjoyed at all, it must be subjected to national regulation. Radio has been the subject of treaties, and the act of 1912 was passed to enforce the provisions of the treaty of that year. In Missouri v. Holland, 252 U. S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984, the Supreme Court, upholding the validity of the Migratory Bird Act (16 USCA § 703 et seq.), said:

"It is not lightly to be assumed that, in matters requiring national action, 'a power which must belong to and somewhere reside in every civilized government' is not to be found. * * * Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. * * * We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed."

■ It does not seem to be open to question that radio transmission and reception among the states are interstate commerce. To be sure it is a new species of commerce. Nothing visible and tangible is transported. There is not even a wire, over which "ideas, wishes, orders, and intelligence" are carried. A device in one state produces energy which reaches every part, however small, of the space affected by its power. Other devices in that space respond to the energy thus transmitted. The joint action of the transmitter owned by one person and the receiver owned by another is essential to the result. But that result is the transmission of intelligence, ideas, and entertainment. It is intercourse, and that intercourse is commerce. Gibbons v. Ogden, 9 Wheat. 1, 68, 6 L. Ed. 23; Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 9, 24 L. Ed. 708; Western Union Telegraph Co. v. Pendleton, 122 U. S. 347, 356, 7 S. Ct. 1126, 30 L. Ed. 1187; International Text Book Co. v. Pigg, 217 U. S. 91, 106, 107, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103.

Defendants contend that while Congress may have some measure of control over all interstate radio broadcasting, the Radio Act of 1927 goes far beyond what is reasonably necessary to protect the transmission of such communications. Congress, they assert, not only has attempted to control the communications being transmitted from state to state, as being transactions in interstate commerce, but has dealt with the broadcasting stations themselves as facilities of interstate commerce and has subjected them to regulation and control to the same extent that railroads, telegraph companies and other carriers may be regulated and controlled.

The suggestion that broadcasting which is not for profit is not commerce may be put aside as imposing an unwarranted limitation upon the power of Congress. The broad scope of that power is set forth in the cases which are cited above. See, also, Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407. But if the distinction had any real foundation, a large part of broadcasting is for the business purpose of advertising the broadcaster or the so-called program sponsors who buy broad-

casting time. In view of the nature of broadcasting it would be utterly impossible to regulate and protect one class without bringing the other under the regulatory authority.

The contention that the act, in bringing the broadcasting stations themselves under national control, transcends the power of Congress, overlooks the fundamental nature of this species of commerce. The transmission is brought about by concert of action on the part of broadcaster and receiver. The regulation is for the purpose, not only of protecting the broadcaster in his operations, but also for the purpose of promoting the interests of the public, who are obliged to submit to whatever is sent out for their reception.

The authority of Congress extends to every instrumentality or agency by which commerce is carried on, and the full control of Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. The execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere. Simpson et al. v. Shepard, 230 U. S. 352, 399, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916a, 18, and cases cited.

The necessary limitation upon the number of stations, the interferences resulting from uncontrolled broadcasting in the same channel and the interests of the receiving public require that stations shall be classified, the nature of the service rendered by each class prescribed, wave lengths assigned, the location of stations determined, apparatus supervised—in short, that transmission be brought under a control which, instead of permitting the benefit to the public to be destroyed by conflict and confusion, will make it as great as possible.

In asserting the unreasonableness of the control assumed by Congress defendants stress the rights of the broadcaster. The emphasis should be laid on the receiving public, whose interest it is the duty of the Government, parens patriæ, to protect.

Defendants next assert that the method of regulation prescribed in the Radio Act violates the Fifth Amendment and results in the taking of private property without due process and just compensation.

It is, of course, true, as defendants urge, that the power to regulate commerce is subject to all the limitations imposed by the Constitution, and among them is that of the Fifth Amendment. It is likewise true that, while the United States lacks the police power and that was reserved to the states by the Tenth Amendment, when the United States exerts any of the powers conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose. The Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power. If the nature and conditions of a restriction upon the use or disposition of property are such that a state could, under the police power, impose it consistently with the Fourteenth Amendment, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation (Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146, 156, 157, 40 S. Ct. 106, 64 L. Ed. 194, and cases cited; Brooks v. United States, supra).

It follows, therefore, that the Fifth Amendment does not have the effect of overriding the power of Congress when exerting any of the powers conferred upon it by the Constitution, to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the public, and that all contract and property rights are subject to its fair exercise. Slaughter House Cases, 16 Wall. 36, 63, 21 L. Ed. 394; Atlantic Coast Line R. Co. v. Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721, and cases cited. The enforcement of uncompensated obedience to such a regulation is not an unconstitutional taking of property without compensation or without due process of law. Denver and Rio Grande R. Co. v. Denver, 250 U. S. 241, 244, 39 S. Ct. 450, 63 L. Ed. 958, Atlantic Coast Line v. Goldsboro, supra. Of course, as pointed out in cases relied upon by defendants (Tyson & Bro.-United Theatre Ticket Offices v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, and cases cited; Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, and cases cited), all regulations of this class are subject to judicial scrutiny, and where they are plainly unreasonable and arbitrary, where the means employed have no real and substantial relation to the avowed or ostensible purpose or where there is wan-

ton interference with private rights, the question arises whether the law-making body has exceeded the legitimate bounds of the police power.

The extent to which a state in the exercise of the police power may prescribe regulations which have the effect of exclusion from or limitation of privileges existing by common right, contract, charter, grant or statute and enforce uncompensated obedience thereto is illustrated by the following cases: Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394, in which slaughterhouses were limited in number and location and a regulated monopoly created; Dent v. West Virginia, 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623, in which members of a profession were required to take examinations, even though they had been practicing; Olsen v. Smith, 195 U. S. 332, 25 S. Ct. 52, 49 L. Ed. 224, in which laws limiting the number of pilots were sustained; Goodrich v. Busse, 247 Ill. 366, 93 N. E. 292, 139 Am. St. Rep. 335, 20 Ann. Cas. 589; in which a business attended by a noise amounting to a nuisance was prohibited, Schaake v. Dolley, 85 Kan. 598, 118 P. 80, 37 L. R. A. (N. S.) 877, Ann. Cas. 1913A, 254, and State ex rel. v. Securities Co., 145 Minn. 221, 176 N. W. 759; in which banks were limited in number and location; People v. Harrison, 256 Ill. 102, 99 N. E. 903, Ann. Cas. 1913E, 362, in which denial of a renewal of a dramshop license was sustained, where the number of licenses was limited.

Illustrations of the exercise of the federal regulatory power for a permitted purpose without making compensation are found in the following cases: Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525, in which it was held that there was no such vested right to trade with foreign nations as to limit the power of Congress to restrain certain importations from considerations of public policy, the court saying, "We entertain no doubt that it was competent for Congress, by statute, under the power to regulate foreign commerce, to establish standards and provide that no right should exist to import teas from foreign countries into the United States, unless such teas should be equal to the standards;" Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570, and Greenleaf Lumber Co. v. Garrison, 237 U. S. 251, 35 S. Ct. 551, 59 L. Ed. 939, in which the right to establish harbor lines was sustained against rights derived under a contract with a state; Louisville Bridge Co. v. U. S., 242 U. S. 409, 37 S. Ct. 158, 61 L. Ed. 395, in which a bridge erected in accordance with an act of Congress was required to be altered, without compensation,

to conform to the orders of the Secretary of War.

Did Congress in the Radio Act exceed the legitimate bounds of the federal regulatory power? We are not dealing in this branch of the case with the validity of an order of the commission excluding an applicant from the radio field, nor are we determining the extent to which, under the prescribed standard, consideration is to be given to established plants. We are dealing with the constitutionality of a statute which requires a license and permits the commission, in apportioning licenses in a limited field, to exclude, in the public interest, an applicant, even though he may have been operating under a license. The act in this respect is well within the regulatory power of Congress. The provisions of the act prescribed the only method by which order could be brought out of chaos and this form of interstate commerce saved from destruction.

Any kind of regulation in a limited field necessarily includes the possibility that some may be excluded from the field. Unregulated broadcasting would create a national nuisance, and the power of Congress extends to the adoption of all measures reasonably necessary for its prevention. The rights of the individual broadcaster must give way to the paramount interest of the millions of the receiving public, who are entitled to have the waves sent out by broadcasting stations classified and arranged in such a way that the benefits resulting from this great scientific discovery may not be impaired or destroyed.

Just what is the property right which is claimed for the broadcaster when it is subjected to analysis? When we speak of wave lengths or frequencies, we are dealing with intangible things, about which we really know nothing at all, except as we perceive the effect produced in an electrical device. The waves, it seems, are in some kind of a medium which permeates every particle of matter. Their effect is produced in and upon the property of others. There is no real analogy between this unknown medium and the air or the water. In one aspect, the waves may be treated as intruders. Whatever rights may exist among these intruders in their relations with each other, there certainly is no property right which can be asserted against the right of those upon whom the intrusion is made to have the intruders come "by cold gradation and well-balanced form," and not in a mob. In the very nature of things, there can be no right to the use of any particular frequency or wave length, or of the ether as against the legitimate exercise

of the regulatory power of the United States.

The provision of section 5 (47 USCA § 85) requiring a waiver from applicants for licenses does not add anything to the regulatory power of the United States, nor can it be interpreted as a recognition of any right on the part of the broadcaster which he would have had, if he had not been forced to sign the waiver.

 Licenses under the Acts of 1912 or 1927, whatever their form or term may be, do not detract from the regulatory power of Congress in the public interest. This regulatory power, like the police power of the state, can neither be abdicated nor bargained away. It is inalienable, even by express grant. Atlantic Coast Line Ry. Co. v. Goldsboro, supra; Union Dry Goods Co. v. Georgia Pub. Serv. Corp., 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; St. Louis Poster Co. v. St. Louis, 249 U. S. 269, 39 S. Ct. 274, 63 L. Ed. 599; United States v. Chandler-Dunbar Co., 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063.

Considering the nature of radio, the limitations of its field of operation, the history of radio regulation, the circumstances existing immediately prior to the passage of the Radio Act of 1927, the complex problems to be solved, and the purposes of the legislation, it must be held that the Radio Act of 1927 and its amendment of 1928 are appropriate and adapted to the ends sought, and specifically that the provisions regulating the number of broadcasting stations and licenses are also appropriate, adapted, and valid.

 It is next objected to the Radio Act of 1927 that the standard prescribed to govern the issuance of licenses is arbitrary, and therefore that Congress has made an improper delegation of legislative power to the Radio Commission.

Section 10 of the act provides that the licensing authority, if public convenience, interest, or necessity will be served thereby, subject to the limitation of the act, shall grant licenses to applicants therefor. The words "public convenience, interest, or necessity," in which the standard is set forth, are taken from the field of public utility legislation, and are found frequently in statutes relating to the issuing of certificates or licenses for public utility construction and operation. The phrase is similar to the one found in paragraph 18 of section 1 of the Interstate Commerce Act (41 Stat. 477 [49 USCA § 1]), in which the standard for issuing certificates by the Interstate Commerce Commission for new or extended railroad construction or operation is set forth.

The objection to the statute is that it furnishes no standard for determining what will be served by public convenience, interest, or necessity, and hence leaves decision to arbitrary judgment, whim, and caprice, or, aside from those extremes, leaves it to the different views which may be taken of public convenience, interest, or necessity.

It has been pointed out repeatedly that while administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. In Mutual Film Co. v. Industrial Commission, 236 U. S. 230, 245, 35 S. Ct. 387, 392 (59 L. Ed. 552), the court said:

"Undoubtedly the Legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws, and in an effort to detail and to particularize, they would miss sufficiency both in provision and execution. * * * General terms get precision from the sense and experience of men and become certain and useful guides in reasoning and conduct. The exact specification of the instances of their application would be as impossible as the attempt would be futile. Upon such sense and experience, therefore, the law properly relies. * * * If this were not so, the many administrative agencies created by the state and national governments would be denuded of their utility and government in some of its most important exercises become impossible."

The words of the standard of public convenience or necessity must be read in connection with other portions of the act and interpreted in the light of its purpose. The act requires the commission to make equality of broadcasting service between the zones and the stations therein, to prevent interference, and to establish good service. The amendment of 1928 requires equality of broadcasting service between the zones to be established by granting or refusing licenses or renewals, changing periods of time for operation, and increasing or decreasing station power, "when applications are made for licenses or renewals of licenses."

The sufficiency of the words "public convenience, interest, or necessity," when read in their relation to the remainder of the act, to declare the policy of the law and fix the legal principles which are to control in given cases is shown by the following illustrative cases: Mutual Film Corporation v. Industrial Commission, supra; Hampton, Jr., &

Co. v. United States, 276 U. S. 394, 396, 48 S. Ct. 348, 72 L. Ed. 624; United States v. Chemical Foundation, Inc., 272 U. S. 1, 12, 47 S. Ct. 1, 71 L. Ed. 131; Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. Ed. 549; Douglas v. Noble, 261 U. S. 165, 169, 43 S. Ct. 303, 67 L. Ed. 590; Inter-Mountain Rate Cases, 234 U. S. 476, 486, 34 S. Ct. 986, 58 L. Ed. 1408; Red "C" Oil Mfg. Co. v. Board of Agriculture, 222 U. S. 380, 32 S. Ct. 152, 56 L. Ed. 240; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435; Union Bridge Co. v. United States, 204 U. S. 364, 385, 27 S. Ct. 367, 51 L. Ed. 523; Lieberman v. Van De Carr, 199 U. S. 552, 561, 562, 26 S. Ct. 144, 50 L. Ed. 305; Buttfield v. Stranahan, 192 U. S. 470, 491, 493, 496, 24 S. Ct. 349, 48 L. Ed. 525; Gundling v. Chicago, 177 U. S. 183, 20 S. Ct. 633, 44 L. Ed. 725; Field v. Clark, 143 U. S. 649, 681, 693, 694, 12 S. Ct. 495, 36 L. Ed. 294.

The objections to the Radio Act of 1927 on the ground of unconstitutionality are not sustained. The conclusions stated by this court in White v. Radio Commission, 29 F. (2d) 113, are adhered to.

Defendants assert that the United States must fail in its case because the order of the commission denying their application for renewal of license is void. It is difficult to see how the validity of that order can be drawn into question in this proceeding. If the statute is valid, the defendants must have a license to broadcast. This is not a suit to enforce an order of the commission. The suit is based on the statute. It does not aid the defendant in this proceeding to say that the order is invalid. A void order denying a license is not the equivalent of an order granting affirmatively permission to operate a station. A void order is no order. The defendants are still without a license. Their remedy is to have the action of the commission reviewed by the court which is given that jurisdiction by the act. This court has no jurisdiction to review the order of the commission.

But it cannot be said that the order of the commission is void. If the statute is valid, the commission, in refusing the license, was acting within its constitutional and stat-utory authority. The alleged failure to give proper consideration to the asserted rights of the defendant in refusing the license goes to the reasonableness of the action of the commission in the public interest. An order affecting the rights claimed by the defendant may be erroneous. It cannot be void, unless the action of the commission is arbitrary, or contrary to the indisputable character of the evidence.

Plainly it cannot be said that the order here is wholly without evidence. The hearing of defendants' application was part of a general hearing affecting many stations. In addition, General Order 40 is not brought in issue in this case and must be presumed to be valid. Under that order the frequency of 1,190 kilocycles was assigned to the third zone as a clear channel and was not available to be granted to defendants.

The record contains the applications of the other 196 stations in this zone. Each of the applications states essential facts as to the station covered by it. A number of stations were cited to appear at the same time, and the commission notified them that they would have the burden of showing that they were entitled to renewal of their permits. Defendants did not then claim that the burden was on the commission to show they were not entitled to a permit. The hearing was practically a consolidated hearing. The evidence of the commission was offered as to all stations cited under General Order 32. The evidence as to the other stations is not in the record submitted.

Under the statute the burden is on the applicant to show that he is entitled to a license. Chicago Grain Products Co. v. Mellon (C. C. A.) 14 F.(2d) 363, 364. This court cannot say that the order of the commission is wholly unsupported by evidence or is clearly arbitrary or capricious. Silber-schein v. United States, 266 U. S. 221, 225, 45 S. Ct. 69, 69 L. Ed. 256; Ma-King v. Blair, 271 U. S. 479, 483, 46 S. Ct. 544, 70 L. Ed. 1046; Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435; Lieberman v. Van De Carr, 199 U. S. 552, 26 S. Ct. 144, 50 L. Ed. 305.

The injunction will issue.