ODOM, J.
 

 Relator, who owns thirty shares of fully paid stock in the respondent homestead association, made written application to withdraw his shares in September, 1929, pursuant to the provisions of section 7, Act No. 120 of 1902, as amended by Act No. 280 of 1916. The present suit was filed on May 25, 1931, up to which time his claim had not been paid.
 

 He alleges that it is the mandatory duty of the respondent association to set aside one-half of its receipts for the payment of withdrawals when it is unable to pay them within sixty days from the dáte the application is made; and that from May 14, 1929,
 
 to
 
 April 27, 1931, respondent has collected the gross sum of $841,438.77; and that for the corre
 
 *983
 
 sponding period, it has paid on withdrawal applications only $87,280.31.
 

 He further alleges that one-half the gross amount collected, 'or $420,719.41, should have been set aside for the payment of withdrawals, but that notwithstanding his protest, the officers and directors of the said association have refused to comply with the law by setting aside said amount for the payment of withdrawals and that its refusal to do so has deprived him of his rights to be paid.
 

 He prayed that mandamus issue directed to the association and its officers and directors commanding them to comply with the demands made in his petition or show cause to the contrary. An alternative writ issued as prayed for.
 

 Respondent excepted to relator’s petition on the grounds that it set out no cause or right of action and that the action, if any plaintiff had, was premature.
 

 The exceptions of no cause and no right of action were sustained by the trial court and relator’s suit was dismissed at his costs. He appealed.
 

 1. The only question presented is whether it is the mandatory duty of the respondent homestead association to' set aside one-half its gross receipts for the payment of the claims of withdrawing stockholders. Relator contends that it is. On the contrary, respondent contends that under the law it is required to set aside one-half of such portion only of its net receipts as are legally available for such purpose.
 

 This involves an interpretation of Act No. 120 of 1902, as amended by Act No. 280 of 1916, under which law the homestead association was organized.
 

 Section 7 of the act, as amended, provides that a member may withdraw his shares or credits thereon at any time by giving written notice of such intention and shall then be entitled to receive the amount paid in by him and such proportion of the profits as the act of incorporation or by-laws may prescribe, less fines, charges, expenses, and losses as the board of directors may determine, and that such association shall keep a register of notices of withdrawal “in the order in which they are filed, giving dates of notices and amounts to be withdrawn, and shall pay the same in the order in which such notices of intention to withdraw were filed,” and:
 

 “Whenever the proportion of receipts ordinarily made applicable to the demands of withdrawing members by resolution of the board of directors is not sufficient to pay all such demands within sixty days from date of notice, one-half of its receipts shall thereafter be applied to the liquidation of the claims of withdrawing members until all deferred claims are paid.”
 

 Section 3 of the act, as amended by Act No. 280 of 1916, provides that homestead associations shall have power to borrow money and to issue evidences of indebtedness therefor and are “authorized and empowered to assign or pledge their securities or notes as security for the repayment of money so borrowed,” and to acquire for certain purposes and under certain conditions, real estate.
 

 Section 14 provides for the payment of all expenses of the association out of its earnings and that monthly, quarterly, semi-annually or annually, as may be specified in the act of
 
 *985
 
 incorporation, the gross earnings of the corporation shall be ascertained “from which shall be first deducted the expenses of the association, and from the balance there shall be set aside at least three per cent of the net earnings as a fund for the payment of contingent losses until fund reaches two and one-half per cent of the outstanding loans.”
 

 2. Under section 7 of the act, as amended, a member of the association may withdraw his shares of stock at any time by giving written notice of his intention to do so and provision is made for the payment of the amount due him. In case the proportion of receipts ordinarily made applicable to the demands of withdrawing members by resolution of the board of directors is not sufficient to pay all such demands, within a specified time, then one-half its receipts shall thereafter he set aside and applied to the liquidation of such demands.
 

 The provisions of the act for the payment of such claims are mandatory. If the association has on hand funds out of which such claims may be paid under the law, it is the plain duty of the board of directors to make provisions for their payment, and in-case it refuses to do so, mandamus proceedings will lie to compel the performance of that duty.
 

 3. By giving to shareholders the right to withdraw their shares and by prescribing the method by which funds are to be made available for the payment of their claims when their applications to withdraw are filed, the lawmaker gave to them a privilege which cannot be denied them. But it was not intended that such right and privilege might be so exercised as to jeopardize the interest of the association of which such shareholders are members or to impair the rights of its creditors. Nor was it intended to give to those shareholders who wish to withdraw an undue, unfair advantage of the other shareholders. It is not reasonable to assume that the lawmaker intended to give to any group or set of shareholders the privilege and power to strike down the corporation itself or to afford them a remedy by which their claims might be made paramount not only to the rights of creditors, but to the interest of the investing public.
 

 Tet such would, we think, be the inevitable results if the act be interpreted to mean that in ease there are not funds on hand sufficient to pay the claims of withdrawing shareholders, then one-half the gross receipts of the association shall be set aside for that purpose. This is the interpretation which relator would have us give to the act. The following observations will demonstrate the fallacy of such contention:
 

 4.As we have stated, homestead associations are authorized to borrow money and to issue evidences of their indebtedness therefor and to assign or pledge their securities or notes as security for the repayment of the amounts so borrowed. They are also empowered to acquire and own, under certain conditions, real estate and are required to pay all expenses incurred in the operation of their business out of their earnings, and to set aside at least 3 per cent, of their net earnings as a fund for the payment of contingent losses.
 

 The obligation of such associations to pay their just debts is paramount to the
 
 *987
 
 rights of shareholders. Under no theory can it be said that such associations can be compelled to set aside for the payment of the claims of withdrawing shareholders such of its receipts as are necessary and which have been pledged for the repayment of money borrowed. Such procedure would result in the impairment of its obligations. If the Legislature intended that such might be done, the enactment would be violative of section 15, art. 4, of the Constitution of 1921, which provides that no law impairing the obligation of contracts shall be passed. When homestead associations pledge their notes or securities, which they are authorized to do under the act, for the payment of their debts, all payments made on the pledged notes or securities to the association must of necessity be paid over to the pledgee. These payments are part of the gross receipts of the association. The lawmaker did not intend that such “receipts” be diverted from the ordinary channels for the payment of the claims of withdrawing shareholders.
 

 5. In addition to these obligations, the associations have fixed operating charges and expenses which they must pay from their gross receipts in order that they may exist as going concerns. They must pay the salaries of their officers and employees, must pay insurance and taxes on their property, and keep it in repair.
 

 The obligation of homestead associations to pay their debts and fixed expenses primes their obligation to provide for the payment of the claims of withdrawing shareholders.
 

 Relator alleges and respondent admits that during the period from May 14,1929, to April 30, 1931, the gross collections or receipts of the association amounted to more than $841,-000. Relator contends that one-half this amount should have been set aside for the benefit of withdrawing shareholders.
 

 There is attached to defendant’s pleadings a statement, conceded i.o be correct, which shows that during the above-stated period the association paid out of its gross collections and receipts for repayment of money borrowed and interest thereon, foreclosure costs, attorneys’ fees, salaries, wages and office expense, real estate operating costs, repairs for damage caused by fire, taxes, repairs to repossessed property, and costs for audits, more than $530,000, or approximately two-thirds of its gross receipts. That these payments were authorized by law and were necessary can hardly be gainsaid. It therefore manifestly appears that the interpretation which relator gives to the statute is untenable.
 

 6. Relator bases his contention upon the following provision in section 7 of the act, as amended:
 

 “Whenever the proportion of receipts ordinarily made applicable to the demands of withdrawing members by resolution of the board of directors is not sufficient to pay all such demands within sixty days from date of notice, one-half of its receipts shall thereafter be applied to the liquidation of the claims of withdrawing members until all deferred claims are paid.”
 

 Under this provision of the statute, it is discretionary with the board of directors as to what proportion of the receipts may be made applicable to the demands of withdrawing members, which proportion is to be des
 
 *989
 
 ignated by resolution. The board may, under ordinary conditions, fix that proportion or percentage at less than half. But if the proportion so designated be insufficient to pay such demands within sixty days, then it becomes the mandatory duty of the board to set apart as much as one-half the receipts until all deferred claims are paid.
 

 7. But the term “receipts” as used in the statute does not mean gross intake or gross collections made by the association.
 

 It relates rather to net receipts or to those funds coming into the hands of the association which may reasonably be made available for the payment of such claims after paying the primary obligations and necessary expenses of the association. This we think is a sound and reasonable interpretation of the act. It is the interpretation given it by the state banking department, which has supervision of homestead associations.
 

 In a bulletin recently issued by the department, it is said:
 

 “It can not be denied that bank and other loans, as well as the necessary expenses of operation and property maintenance, constitute paramount corporate obligations; and it has accordingly been the consistent policy of this department, based on what it considers to be a sound and reasonable interpretation of the terms of the statute, that the directors of the several associations must necessarily provide for the payment of such obligations before allocating funds for the payment of withdrawing shareholders.”
 

 The trial judge correctly held that relator’s petition sets out no cause or right of action.
 

 Judgment affirmed.