ODOM, Justice.
 

 On September 10,1933, plaintiff and defendant entered into an agreement by the terms of which plaintiff agreed to sell to defendant certain described real estate situated in New Orleans at a stipulated price, and defendant agreed to purchase the sam.e at the price named. Defendant refused to carry out his agreement to purchase on the ground that the title to the property was not a good, valid, and merchantable title, and was suggestive of litigation.
 

 Plaintiff brought the present suit against defendant to compel specific performance of his contract to purchase. Prom a judgment in plaintiff’s favor, defendant appealed.
 

 The reason assigned by defendant whjr the title to the property is not valid, and is suggestive of litigation is that plaintiff acquired it from the Phoenix Building & Homestead Association of New Orleans, which in turn had acquired it by foreclosure from a defaulting borrower, in accordance with the by-laws, rules and regulations of the association; and that, in making the sale to plaintiff, the homestead association had accepted, -as the sale price thereof, unpledged and fully paid stock of the association, as permitted by section 57, Act No. 140 of 1932; that, previous to the date on which the homestead association had sold to plaintiff, accepting said stock as the
 
 *433
 
 price, numerous stockholders of the association had filed notices of their intention to withdraw the stock owned by them, as provided in section 7, Act No. 280 of 1916 (page 570); that the stock represented by this withdrawal list aggregated many thousands of dollars; that all these applications had been filed prior to July 27, 1932, the date on which Act No. 140 of 1932 was adopted.
 

 It is contended that the filing of these notices of intention to withdraw vested in said stockholders certain rights, among them being the right to be paid in preference to any stockholder who had not filed such notice, and the right to require that none of the assets of the association should be disposed of in any manner which would not add the price of the disposal to the funds out of which the withdrawing stockholders had the right to be paid.
 

 It is argued by counsel for defendant that, by permitting plaintiff to purchase this repossessed property with unpledged fully paid stock, the homestead association, in effect, paid' plaintiff the value of his stock, which was not on the withdrawal list, to the prejudice of the rights of those who had filed their applications to withdraw, in violation of section 7 of the act of 1916, which provides that “each association shall keep a register of notices of withdrawal in the' order in which they are filed, giving dates of notices and amounts to be withdrawn, and shall pay the same in the order in which such notices of intention to withdraw were filed”; that this method of paying stockholders who have not given notice of intention to withdraw is a discrimination in favor of them and against those who have filed such notices; that it permits, in effect, stockholders to withdraw without filing notice of such intention, as provided in the act of 1916, and without complying with the charter and by-laws of the association; that, by this method, the homestead association is permitting some of the stockholders to get possession of the assets of the association to the detriment of those who have signified their intention to withdraw.
 

 This, it is argued, divests the vested rights of the withdrawing stockholders, and is therefore illegal, for which reason the sale of this property by the homestead association to plaintiff was illegal, and its title is therefore invalid.
 

 It is not disputed, but admitted, that the homestead association was authorized to make the sale as it did by section 57, Act No. 140 of 1932, which reads in part as follows:
 

 “An association (meaning a building and homestead association such as this one), in payment and settlement of the price and com sideration of any sales made of any real estate belonging to it, and acquired by repossession or otherwise, may accept unpledged shares of said association at a value not greater than par, and such transfers shall be in all respects legal and binding.”
 

 It is conceded that, if section 57 of the act of 1932 is valid legislation, the sale by the homestead association to plaintiff was legal and its title is good. But it is contended that section 57 of that act is unconstitutional, in that it impairs the obligation of contracts in violation of section 10, art. 1, of the Federal Constitution, which provides that no state shall have power to pass any law “impairing the Obligation of Contracts,” and section 15, art. 4, Constitution of 1921, of this state, which reads as follows:
 

 
 *435
 
 “No ex-post facto law, nor any law impairing the obligation of contracts, shall be passed ; nor shall vested rights be divested, unless for purposes of public utility, and for just and adequate compensation previously paid.”
 

 The sole question presented, then, is whether section 57, Act No. 140 of 1932, is constitutional. The only ground on which it is contended that this section of the act is unconstitutional is that it authorizes and permits homestead associations to divest the statutory rights of those stockholders who had, previous to the date on which the act was adopted, filed notices of their intention to withdraw their stock, and to impair the obligation which the association was under to pay them in the order in which such notices of intention were filed or by preference according to the date of the filings.
 

 Whether section 57 of the act of 1932 is unconstitutional on the ground mentioned, therefore, depends upon what were the rights of withdrawing stockholders under Act No. 280 of 1916, which finally amended certain sections of Act No. 120 of 1902, the original act which provided for the organization, regulation, supervision, and inspection of local and foreign building and loan homestead associations.
 

 Section 7, Act No. 280 of 1916 (page 570), provided that a member might withdraw his .shares or credits thereon at any time by giving written notice of isuch intention, and should then be entitled to receive the amount paid in by him and such proportion of the profits as the act of incorporation or by-laws prescribed, less fines, charges, expenses, and losses as the board of directors might determine.
 

 It provided further that the association should keep a register of notices of withdrawal, in the order in which they were filed, giving dates of the notices and the amounts to be withdrawn, “and shall pay the same in the order in which such notices of intention to withdraw were filed.” And the act went on and further provided that “whenever the proportion of receipts
 
 ordinarily made applicable
 
 to the demands of withdrawing members by resolution of the board of directors is not sufficient to pay all such demands within sixty days from date of notice,
 
 one-half of its receipts shall thereafter
 
 be applied to the liquidation of the claims of withdrawing members until all deferred claims are paid.” (Italics ours.)
 

 Whether withdrawing stockholders received the amounts which they had paid in and such proportion of the profits as the act of incorporation and by-laws prescribed depended upon whether there was an available fund out of which their claims might be paid. The notice of intention to withdraw was nothing more than an application by the stockholder to be paid, in cash, the amount paid in by him, out of such receipts as were available for that purpose.
 

 In State ex rel. Orlando v. Reliance Homestead Association, 174 La. 980, 142 So. 146, 148, we held that the “obligation of homestead associations to pay their debts and fixed expenses primes their obligation to provide for the payment of the claims of withdrawing shareholders,” and, as to the “receipts” mentioned in section 7 of the act, it was held that the term did not mean “gross intake,” but “it relates rather, to net receipts or to those funds coming into the hands of the association
 
 *437
 
 which may reasonably be made available for the payment of such claims after paying the primary obligations and necessary expenses of the association.”
 

 It thus appears that the only right enjoyed by withdrawing shareholders over non-withdrawing members under the act of 1916 was the right to be paid the amount of their claims out of the fund available for that pain-pose, and further that the only obligation of the association to the withdrawing members, not owed to others by it, was to pay their claims out of the available receipts. So that the notice of intention to withdraw. availed the stockholder nothing if there was no accumulated fund from which his claim might be paid.
 

 This right to be paid was not open to those who did not wish to withdraw and who did not give notice of such intention. Hence it is argued, first, that a sale by the association of repossessed property to a nonwithdrawing member and the acceptance of fully paid unpledged stock as the sale price is a payment for the stock; and, second, that such payment impairs the obligation of the association to pay the withdrawing members by preference.
 

 The answer is that, even if it be conceded (and this is doubtful) that such a transaction should be construed as a payment by the association for the stock of a nonwithdrawing member, the payment was not made out of a fund which, under the act of 1916, the charter and the by-laws, was made available for the payment of the withdrawing members, and, as we have pointed out, the only advantage given withdrawing members was to be paid out of a fund specially provided for that purpose. The notice of intent to withdraw did not give any extra privilege on the general assets of the association, as to which, if their claims were not paid out of the special fund made available for that purpose, their rights were the same as other shareholders. They were cut off from sharing in the profits accumulating after notice was given. They remained shareholders, and, aside from the privilege of participating in the profits, their rights remained the same.
 

 The real estate sold by the association to plaintiff was part of its assets, but constituted no part of the fund on which the withdrawing shareholders had first claim. When it was repossessed, its value did not constitute a “receipt,” as that term is used in the act. “Receipts,” as that term is used in section 7 of the act of 1916, means cash receipts, for it is only from cash receipts that claims of withdrawing members may be paid. The purpose of giving notice of intention to withdraw is to gain the privilege of having refunded in cash the amount paid in plus accumulations up to the date of notice. Had the property been sold for a cash consideration, the proceeds should, and no doubt would, have been added to the fund “available” for the payment of withdrawing shareholders.
 

 The purpose of section 57, Act No. 140 of 1932, was to authorize the board of directors of homestead associations to do an administrative act, to dispose of its property in a way deemed to be advantageous to the association and all its stockholders. The Legislature foresaw that under some economic conditions the holding of real estate, especially residential property, which is always subject to a
 
 *439
 
 high percentage of depreciation and heavily-taxed, is a burden and not a benefit to the owner, and that such property is more often a liability than an asset. Eor that reason, no doubt, the Legislature saw fit to permit homestead associations to dispose of their repose sessed and other real estate in the manner provided by the act. As to the wisdom of such legislation, we have nothing to do. We are called upon to pass upon its validity. We think it is valid.
 

 The trial judge held that the section of the act of 1932 attacked is constitutional, and ordered the defendant to perform. We approve his holding, and accordingly affirm the judgment appealed from, with all costs.
 

 ST. PAUL, J., absent.