*946
 
 O’NIELL, Chief Justice.
 

 The plaintiff, being a withdrawing shareholder in the Acme Homestead Association, obtained a judgment against the association, declaring that sections 53, 54, 55, and 56 of Act 140 of 1932 are unconstitutional, and enjoining the association from obeying these provisions of the statute. The homestead association has appealed from the decision. There are five other such suits, in each of which the plaintiff obtained a similar judgment and the defendant, homestead association, has appealed, namely, Samuel Sokolosky v. Equitable Homestead Association (La. Sup.) 160 So. 646; Camille Treigle v. Thrift Homestead Association (La. Sup.) 160 So. 646; Treigle Sash Factory, Inc., v. Conservative Homestead Association (La. Sup.) 160 So. 647; Treigle Sash Factory, Inc., v. Union Homestead Association (La. Sup.) 160 So. 647, and Joseph Mitchell v. Conservative Association (La. Sup.) 160 So. 648.
 

 The only question is whether sections 53, 54, 55, and 56 of the Act of 1932 are unconstitutional, as the judge of the civil district court has decided. The plaintiff pleads that the provisions of these sections, which materially change the method of paying claims of withdrawing shareholders in building and loan associations, impair the obligations of contracts, and divest the withdrawing shareholders of their contract rights, and are therefore violative of section 10 of article 1 of the Constitution of the United States, and section 15 of article 4 of the Constitution 1921 of Louisiana; and that these provisions of the statute deprive the withdrawing members of building and loan associations of their property without due process of law, and deny to them the equal protection of the laws, and are therefore violative of section 1 of the Fourteenth Amendment of the Constitution of the United States, and section 2 of article 1 of the Constitution of Louisiana.
 

 By section 7 of Act No. 120 of 1902, as amended by. Act No. 280 of 1916, which was in effect when the plaintiff became a shareholder in the Acme Building & Loan Association and when he applied for withdrawal, it was provided that a member of a building and loan association might withdraw the amount of his shares at any time by giving written notice of his intention so to do, and that he would be entitled then to receive the amount paid in by him, and such proportion of the profits as the charter and by-laws might prescribe, less all fines, charges, expenses, and losses accrued or contingent at the time of notice of withdrawal, as the board-of directors might determine. It was provided also that every building and loan association should keep a register of the notices of withdrawal, and should pay the amounts due to the withdrawing shareholders in the order in which their notices were filed. It was provided further, that, whenever the proportion of receipts ordinarily made applicable to the demands of withdrawing members by resolution of the board of directors was not sufficient to pay all of such demands within sixty days from the date of notice, one-half of the receipts of the association thereafter should be applied to the liquidation of the claims of the withdrawing members until all deferred claims were paid.
 

 In State ex rel. Orlando v. Reliance Homestead Association, 174 La. 980, 142 So. 146, and in Harding Realty Co. v. Blanchard, 179
 
 *948
 
 La. 430, 154 So. 47, 49, it was held that the term “receipts,” in the provision of the statute requiring building and loan associations to apply one-half of their “receipts” to the payment of withdrawals if they were sixty days in arrears, did not mean “gross receipts,” but meant “net receipts,” or funds which might “reasonably be made available for the payment of such claims after paying the primary obligations and necessary expenses of the association.”
 

 In accordance with the provisions of section 7 of the statute then in effect, and the pertinent provisions of the charter and by-laws of the association, the plaintiff gave notice of his intention to withdraw the amount of his shares; and more than sixty days had gone by after the notice was given, when the Act of 1932 came into effect. If the provisions of the act of 1902, as amended by the Act of 1916, had not been superseded as they were by the Act of 1932, the plaintiff would have been entitled to receive the amount of his shares, if and when all previous applications on the withdrawal list would have been paid. And the plaintiff had a right of action to compel the association to apply one-half of its net receipts to the liquidation of the claims of the withdrawing members until all deferred claims were paid.
 

 The Act of 1932 is a complete codification of the laws governing building and loan associations; and, by the terms of the repealing clause, the act supersedes the Act of 1902 and all amendments made previous to the adoption of the Act of 1932. The purport and effect of sections 53, 54, 55, and 56 of the Act off 1932, under the rubric “Withdrawals,” was to abolish the provisions of section 7, of the Act of 1902, as amended by the Act of 1916, so far as those provisions required building and loan associations to pay the claims of withdrawing shareholders in full in the order of the filing of their notices, and to allocate one-half of the net receipts to the payment of such claims if they were not all paid within sixty days from the date of the notice of withdrawal. Section 53 of the new act allows the board of directors of a building and loan association, before appropriating receipts to' the liquidation of the claims of withdrawing members, to use such receipts and funds as are needed for operating expenses and for the maintenance and improvement of repossessed property, and for the payment' or renewal of obligations of the association, and the creation of cash reserves needed for declaring dividends. Section 54 of the new statute provides, as a substitute for the system of paying withdrawals in full in the order of seniority, a new method of distribution, by which each applicant for withdrawal is entitled to one-fourth of the amount of his shares when his name comes to the top of the withdrawal list, and his name is then sent to the foot of the list, to await his turn to receive another fourth of the amount of his shares, when his name comes again to the top of the list. All of that, however, is said to depend upon there being funds available to meet the demands of withdrawing members. If a fourth of a claim at the top of the withdrawal list is less than $500 the applicant is entitled to the minimum of $500, and if the whole claim does not exceed $500 it is paid in full, if there are funds available to pay the claim. Every new application- takes its place at the foot of the list. The association is allowed, in its discretion, to pay in full and on demand, the
 
 *950
 
 claim of any withdrawing member whose claim is less than $100, and may pay a sum •not exceeding $100 .per month to a withdrawing member in emergent circumstances. This .section of the statute provides also that, whenever the amount of the withdrawals exceeds 60 per cent, of the accumulated capital of the association, the state bank commissioner, who is ex officio supervisor of homestead •and building and loan associations, may, if be believes that the condition of the association justifies such action, direct that the payment of withdrawals in the order stated shall be discontinued, and that they shall be paid thereafter on a pro rata basis; the distribution to be made to all members whose names were on the withdrawal list on a date not less than ten days previous to the issuing of the distribution checks. This section of the statute provides, finally, that installment shares which have a fixed maturity, and on account •of which no installment has been delinquent longer than a year during a period exceeding seven years, shall, at their maturity, be preferred over all shares on the withdrawal list, and that no other shares on the withdrawal list shall be cashed until such installment shares have been paid. Section 55 of the. statute provides that a member who has given notice of his intention to withdraw shall remain a shareholder, and be classified as a withdrawing member; that, except as stated in section 53, no liabilities or losses of the association of a date subsequent to the filing •of his notice of withdrawal shall be chargeable or assessable against his shares; and that, from the date of his application to withdraw, and as long as his application for withdrawal has not been withdrawn, he shall not be entitled, except as thereinafter set forth, to any benefit on his shares beyond the collection of the face value thereof, nor to an allowance or dividend in the distribution of the accumulated or current profits or earnings. The expression “as long as his application for withdrawal has not been withdrawn” means that a withdrawing shareholder may at any time withdraw his application for withdrawal, and thenceforth have the advantages of a nonwithdrawing member of the association. This section of the statute purports to forbid a withdrawing shareholder to sue the association for any cause except to enforce the provisions of the statute or to prevent a violation thereof; which means nothing more than that the provisions of the statute shall control both the association and the withdrawing shareholder; and, in furtherance of the right of action of a withdrawing shareholder to enforce the provisions of the statute or to prevent a violation thereof, it is provided that, for such purpose only, a withdrawing shareholder shall have the right to inspect the books and records of the association, under such reasonable rules as the association may prescribe. This section gives the board of directors the right, in its discretion, to payan allowance on applications for withdrawal, under such terms and conditions as to amount of individual withdrawals or period of time on the withdrawal list as the board may prescribe, provided that the rate of such allowance to withdrawing members shall not exceed 60 per cent, of the rate of dividend currently paid to continuing members, and provided that such allowance to withdrawing members may be discontinued at any time without affecting the right of the board to continue to pay dividends on the shares of the continuing mem
 
 *952
 
 bers. Section 56 of the statute declares that the matter of determining the proportion of receipts which shall be attributed to the payment of withdrawals shall be entirely under the control of the board of directors; that the existence of a withdrawal list shall not prevent the making of new loans to continuing members or to new members, to an extent not exceeding one-fourth of the gross receipts, or prevent the use of the funds or receipts of the association for the payment of its debts, no matter when or under what circumstances they were incurred, or for expenses incident to the carrying on of the business. And this section of the statute declares, finally, that dividends, at such rate as the board may deem proper, may be paid to continuing members of the association, out of its earnings or undivided profits, notwithstanding a list of unpaid withdrawals.
 

 The Act of 1932, therefore, did change materially the method formerly established for the payment of the claims of withdrawing members of building and loan associations, and did, in a general way, perhaps, prolong the time in which the claims then on the withdrawal lists of such associations would be paid in full. . But, dealing with the withdrawing members of all building and loan associations throughout the state, as a class, it cannot be said with certainty that the change which was wrought by the Act of 1932 destroyed, or even impaired, the assurance that the claims of these members would be paid eventually in full. Whether the statute impaired the prospect of any individual member, in that respect, depended largely upon his relative position on the withdrawal list, and more largely upon the financial condition of the association itself, and upon its-ability to continue in 'business long enough to pay the claim. The purpose of the Act of 1932 was not to favor any member or class of members to the prejudice of another member or class of members "of a building and loan association, but to benefit indiscriminately all members of such associations, and the general public, by saving these institutions from dissolution, .which they were menaced with, by the financial depression. During normal times, when the Act of 1916 was adopted, and until the financial panic set in, building and loan associations received substantial sums on their stock subseriptions- and made prompt collections of interest and principal on their loans, and were able to pay withdrawals promptly, if not on demand. But when the depression came on, with its-resultant condition of unemployment, and the consequent need of money for household-expenses, there were no funds available for investment in the shares of building and loan-associations, and very little for the payment of debts due to them, or for the payment of interest on the loans they had made. The demands for withdrawals became overwhelming, and whenever a large claim came to the top of the list it blocked indefinitely the-small claims of those who were more in need of their money. The result was, by the time the Act of 1932 was drafted and submitted, to the Legislature by the state bank commissioner, that the business of building and loan associations was stagnant, not only in. Louisiana, but throughout the whole United States. Eor example, the Acme Homestead. Association, defendant in this suit, had, when the Act of 1932 was adopted, 3,902 members, $2,267,000 of outstanding mortgage loans,.
 
 *954
 
 $3,128,895 of assets, and a withdrawal list ■of 540 shareholders, whose claims amounted to $402,217, on which no payment had been made for two years and two months when the new statute came into effect, and on which no payment was made afterwards, up to the time the defendant answered this suit. The Equitable Homestead Association, defendant in another of these suits, had 2,025 members, $1,386,000 of outstanding mortgage loans, $1,803,298 of assets, and a withdrawal list of 276 shareholders, whose claims amounted to $138,540, on which no payment had been made for a year and nine months when the Act of 1932 came into effect, and on which no payment was made afterwards, up to the time the association answered Samuel Sokolosky’s suit. The Thrift Homestead Association, defendant in another of these suits, had 1,962 members, $1,135,900 of outstanding mortgage loans, $1,597,698 of assets and a withdrawal list of 249 shareholders, whose claims amounted to $145,025, on which no payment had been made for more than a year and nine months when the Act •of 1932 came into effect, and on which no payment was made afterwards, up to the tíme the association answered Camille V. Treigle’s suit, except emergency loans, amounting to only $900. The Conservative Homestead Association, defendant in two of these suits, had 6,742 members, $4,720,200 of outstanding mortgage loans, $6,513,684 of assets, and a withdrawal list of 1,078 shareholders, whose claims amounted to $711,632, on which no payment had been made for two years and three months when the Act of 1932 came into effect, and on which.no payment was made afterwards, up to the time the association answered these suits. The Union Homestead Association, defendant in another of these suits, seems to have been in better condition, having 6,966 members, $5,135,000 of outstanding mortgage loans, $5,320,146 of assets, and a withdrawal list of 4S9 shareholders, whose claims amounted to $351,033 on which payments had been made up to a date five months before the Act of 1932 came into effect.
 

 These conditions which we have described, which are disclosed by the record, and which are mainly matters of common knowledge, show that the plaintiff’s contention, that the Act of 1932 interfered with or delayed his receiving in cash the amount of his shares of stock, is merely an opinion, and is problematical, because it is founded upon the assurance, or postulate, that the business of the building and loan association would have withstood the prevailing financial difficulties until half of the net receipts of the business would have been sufficient' to pay off all of the withdrawing shareholders who were ahead of the plaintiff on the withdrawal list.
 

 There is no doubt, however, that the Act of 1932 did prevent some of the many withdrawing shareholders in building and loan associations throughout the state from collecting the amount of their shares in full at the time when payment would have been made if this statute had not been adopted. We shall rest this decision, therefore, upon the proposition that the Act of 1932 did deprive the plaintiff of an advantage, and of a valuable right, which he enjoyed by virtue of having his name on the withdrawal list more than sixty days before the statute was adopted. The question, therefore, is whether the Legislature could deprive the plaintiff
 
 *956
 
 of the advantage and right which he enjoyed, without violating the constitutional limitation forbidding the passing of a law impairing the obligation of contracts, or divesting vested rights.
 

 The objects and purposes for which building and loan associations are created, and the business carried on by them, are matters of “public utility and advantage.” It was so declared by the Legislature itself by Act No. 151 of 1888, and was so recognized by this court in Mayre v. Pierson, 171 La. 1077, 133 So. 163, and in First National Bank v. Louisiana Tax Commission, 175 La. 119, 143 So. 23, and in State ex rel. Cotonio v. Italo-American Homestead Association, 177 La. 766, 149. So. 449. That means' that all business transactions which' individuals have with building and loan associations are, like transactions with savings banks, insurance companies, and the like, subject to regulation and control by the Legislature, in the exercise of the police power. Individuals who acquire stock in building and loan associations know in advance, or are charged with knowledge, that their contract rights which result from their membership in such associations are conferred and controlled by statute and are therefore subject to impairment at any time by an act of the Legislature. The only limitation upon the authority of the Legislature, in that respect, is that the act must be intended for the public welfare, must have reasonable relation to the purpose to be accomplished, and be not arbitrary or discriminating. The courts have no authority to look beyond these requirements, or into the question of expediency of the acts of the Legislature. State ex rel. Civello v. City of New Orleans, 154 La. 271, 97 So. 440, 33 A. L. R. 260; Harding Realty Co. v. Blanchard, 179 La. 430, 154 So. 47; McCray v. United States, 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; McLean v. State of Arkansas, 211 U. S. 539, 547, 29 S. Ct. 206, 53 L. Ed. 315, 319; Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328; Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 S. Ct. 44, 57 L. Ed. 184; Price v. Illinois, 238 U. S. 446, 452, 35 S. Ct. 892. 59 L. Ed. 1400, 1405; Rast v. Van Deman & Lewis Co., 240 U. S. 342, 357, 36 S. Ct. 370, 60 L. Ed. 679, 687, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Merrick v. N. W. Halsey & Co., 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498; Adams v. Tanner, 244 U. S. 590, 37 S. Ct. 662, 61 L. Ed. 1336, L. R. A. 1917F, 1163, Ann. Cas.. 1917D, 973; Green v. Frazier, 253 U. S. 233, 239, 40 S. Ct. 499, 64 L. Ed. 878, 881; Lower Vein Coal Co. v. Industrial-Board of Indiana, 255 U. S. 144, 41 S. Ct. 252, 65 L. Ed. 555; Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577; Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 356, 51 S. Ct. 476, 75 L. Ed. 1112; State of Arizona v. State of California, 283 U. S. 423, 51 S. Ct. 522, 75 L. Ed. 1154; Sproles v. Binford, Sheriff, 286 U. S. 374, 52 S. Ct. 581, 76 L. Ed. 1167; Wabash Valley Electric Co. v. Young, 287 U. S. 488, 53 S. Ct. 234, 77 L. Ed. 447; Williams v. Mayor and City Council of Baltimore, 289 U. S. 36, 53 S. Ct. 431, 77 L. Ed. 1015; Gant v. Oklahoma
 
 *958
 
 City, 289 U. S. 98, 53 S. Ct. 530, 77 L. Ed. 1058.
 

 From the fact, of which there is no dispute, that the business of building and loan associations is of a public character, or matter “of public utility and advantage” and therefore subject to regulation and control by the Legislature in the exercise of the police power, it must follow -that the authority .of the Legislature in that respect cannot be frustrated or forestalled by the making of private contracts with building and loan associations. The reason is that the constitutional prohibition against legislation “impairing the obligation of contracts” does not protect contracts which “deal with a subject-matter which lies within the control of the Congress” or the Legislature. It was so said by Chief Justice Hughes in the Gold Clause Cases (Norman v. Baltimore & Ohio Railroad Co. and United States v. Bankers’ Trust Co.), 294 U. S. —, 55 S. C. 407, 411, 79 L. Ed. —, 95 A. L. R. 1352; from which decision we excerpt these appropriate paragraphs, viz.:
 

 “We have not attempted to summarize all the provisions of these measures. We are not concerned with their wisdom. The question before the Court is one of power, not of policy. * * *
 

 “The conclusion was [in Knox v. Lee, 12 Wall. 457, 20 L. Ed. 287] that contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the government, and that no obligation of a contract ‘can extend to the defeat’ of that authority. * * *
 

 “Contracts, however express, cannot fetter the constitutional authority of the Congress [or the Legislature]. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress [or the Legislature], they have a congenital infirmity. Parties cannot remove their transactions from1 the reach of dominant constitutional power by making contracts about them. See Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560. * * *
 

 “Applying that principle, the Court held that a contract, valid when made (in 1871) for the giving of a free pass by an interstate carrier, in consideration of a release of a claim for damages, could not be enforced after the Congress had passed the Act of June 29, 1906, 34 Stat. 584. Louisville & Nashville Railroad Company v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 270, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. Quoting the statement of the general principle in the legal tender cases, the Court decided that the agreement-must necessarily be regarded as having been made subject to the possibility that, at some future time, the Congress' ‘might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable, or to impair its value.’ The Court considered it inconceivable that the exercise of such power ‘may be hampered or restricted to any extent by contracts previously made between individuals or corporations.’ ‘The framers of the Constitution never intended any such state of things to exist.’ Id., page 482 of 219 U. S., 31 S. Ct. 265, 270. * * *
 

 “The principle is not limited to the incidental effect of the exercise by the Congress [or the Legislature] of its constitutional au
 
 *960
 
 thority. There is no constitutional ground for denying to the Congress [or the Legislature] the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt. *. *• *
 

 “Whether they [the contracts in question] may be deemed to be such an interference depends upon an appraisement of economic conditions and upon determinations of questions of fact. With respect to those conditions and determinations, the Congress [or the Legislature] is entitled to its own judgment. We may inquire whether its action is arbitrary or capricious, that is, whether it has reasonable relation to a legitimate end. If it is an appropriate means to such an end, the decisions of the Congress [or the Legislature] as to the degree of the necessity for the adoption of that means, is final. * * *
 

 “We are not concerned with consequences, in the sense that consequences, however serious, may excuse an invasion of constitutional right. We are concerned with the constitutional power of the Congress [or the Legislature] * * * and its attempted frustration.”
 

 Although the facts of the present ease are not like the facts in the .Gold Clause Cases, the principle which controlled the decision in the Gold Clause Cases is appropriate here, where the contract with the building and loan association dealt with á subject-matter which was within the control of the Legislature. The same principle was applied in the Legal Tender Cases (Knox v. Lee, and Parker v. Davis), 12 Wall. 457, 20 L. Ed. 287; which were cited by the Chief Justice in the Gold Clause Cases. And the same principle was held to destroy or impair the contracts which were set up in the following cases: Manigault. v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274; Polk v. Mutual Reserve Fund Life Association, 207 U. S. 310, 28 S. Ct. 65, 52 L. Ed. 222; Hudson County Water Co. v. McCarter, Attorney General, 209 U. S. 349, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560, cited by the Chief Justice in the Gold Clause Cases; Louisville & Nashville v. Mottley et ux., 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, also cited by the Chief Justice in the Gold Clause Cases; Sproles v. Binford, Sheriff, 286 U. S. 374, 52 S. Ct. 581, 76 L. Ed. 1167, also cited by the Chief Justice in the Gold Clause Cases; Atlantic Coast. Line Railroad Co. v. City of Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721, 726; Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 S. Ct 117, 118, 63 L. Ed. 309, 9 A. L. R. 1420, also cited by the Chief Justice in the Gold Clause Cases; Dillingham v. McLaughlin, 264 U. S. 370, 44 S. Ct. 362, 364, 68 L. Ed. 742, and Stephenson v. Binford, 287 U. S. 251, 53 S. Ct. 181, 77 L. Ed. 288, 87 A. L. R. 721, also cited by the Chief Justice in the Gold Clause Cases.
 

 In Union Dry Goods Co. v. Georgia Public Service Corporation, supra, the court restated the doctrine, from the earlier cases, thus:
 

 “That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in Manigault v. Springs, 199 U. S. 473,
 
 *962
 
 480, 26 S. Ct. 127, 130, 50 L. Ed. 274 [278], it was declared that:
 

 “ ‘It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from’ properly exercising its police powers ‘for the general good of the public, though contracts previously entered into between individuals may thereby be affected.’
 

 “This on authority of many cases which are cited.
 

 “In Hudson County Water Co. v. McCarter, 209 U. S. 349, 357, 28 S. Ct. 529, 531, 52 L. Ed. 828 [832], 14 Ann. Cas. 560, it is said that:
 

 “ ‘One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter.’
 

 “In Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 482, 31 S. Ct. 265, 270, 55 L. Ed. 297 [303], 34 L. R. A. (N. S.) 671, this is quoted with approval from the Legal Tender Cases, 12 Wall. 457, 550, 551, 20 L. Ed. 287 [311, 312], viz.:
 

 “ ‘Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.’
 

 “In the same report, in Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. [549] 567, 31 S. Ct 259, 262, 55 L. Ed. 328 [338], it is said:
 

 “ ‘There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.’
 

 “In Atlantic Coast Line R. Co. v. Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 368, 58 L. Ed. 721 [726], the court said:
 

 “ ‘It is settled that neither the “contract” clause nor the “due process” clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.’
 

 “And in Rail & River Coal Co. v. [Yaple] Ohio Industrial Commission, 236 U. S. 338, 349, 35 S. Ct. 359, 362, 59 L. Ed. 607 [615], the state of the law .upon the subject is thus aptly described:
 

 “ ‘This court has so often affirmed the right of the state in the exercise of its police power to place reasonable restraints, like that here involved, upon the freedom of contract, that we need only to refer to some of the eases in passing.’
 

 “These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the
 
 *964
 
 exigencies of the public welfare when determined in an appropriate manner by the authority of the state.”
 

 In Dillingham v. McLaughlin, supra, the court cited many of the decisions which we have cited, in support of this conclusion:
 

 “The operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future.”
 

 It might be argued, and we presume that it was argued in the many cases which we have cited, that, if the contract clause in the Constitution does not protect contracts dealing with a subject-matter which the Congress or the Legislature has the authority to control or regulate, the contract clause is an unnecessary provision in the Constitution, because legislation on a subject-matter which the Congress or the Legislature has not the authority to control or regulate would be invalid, regardless of the contract clause. That argument, however, is considered as having been answered and forever settled by the many decisions, which we have cited, of the highest court in the land. The principle does not seem, to be affected by the fact that, while the Congress cannot legislate on any subject-matter not permitted by the Constitution, the Legislature may legislate on any subject-matter not forbidden by the Constitution-. In Louisiana every individual who has dealt with a building and loan association during the last forty-seven years was notified by Act 151 of 1888 that he was dealing with a corporation of “public utility and advantage.”
 

 We do not find anything unreasonable, arbitrary, or discriminating in sections 53, 54, 55, and 56 of Act No. 140 of 1932, or in any one of these sections. That their provisions are appropriate to the object, of saving the building and loan associations from liquidation and of reviving their business, and of thereby benefiting all of the shareholder's as a class and the public generally, is obvious, and is vouchsafed by the fact that the statute was drafted and recommended by the state bank commissioner, who, according to section 18 of article 6 of the Constitution of 1921 and section 64 of the Act of 1932, is ex officio supervisor of homestead and building and loan associations.
 

 Our attention.is called to similar statutes which have been enacted in many other states during the last few years of the financial depression; and we are not aware of any instance where provisions such as are questioned in this case have been declared, unconstitutional by a court of last resort. In Fornataro and Romano v. Atlantic Coast Building & Loan Association, 163 A. 240, 10 N. J. Misc. 1248, the plaintiffs, -being withdrawing shareholders in the association, contended that a statute of 1932 (chapter 102, P. L. 1932, p. 175 [N. J. St. Annual 1932, § 27 — R52]), similar to the Louisiana statute of 1932, could not deprive them of their rights acquired under a previous statute (chapter 65, P. L. 1925, §- 52, p. 212, Comp. St. Supp. 1930, § 27- — R52) without violating the obligations of the contract between them and the association. The Supreme Court of New Jersey ruled against the plaintiffs’ contention, quoting literally, and basing its decision upon, the paragraph which was quoted in Union Dry Goods Co. v. Georgia Public Service Corporation, from Manigault v. Springs, supra.
 

 
 *966
 
 The plaintiff cites Sundheim’s work entitled, Law of Building and Loan Associations (3d Ed.) § 159, pp. 161, 162, viz.:
 

 “The courts in the United States generally hold that the right to withdraw, after full compliance with all the conditions of the statute or by-laws, is a vested contractual right, and any change which impairs the substance of the right after it has become vested by membership is invalid as to existing members, but slight changes affecting the remedy only may be made. Thus, where the right to withdraw under the original bylaws was unconditional, an amendment providing that only one-half of the receipts should be applicable to withdrawals is not binding on existing members. * * * After the withdrawal has been perfected, by the matuz-ity of the notice, a statute or by-law which changes the order of payment to his disadvantage violates the member’s vested right and is therefore unconstitutional and void as to him.”
 

 The cases which the author cites in support of these statements are Holyoke Building & Loan Association v. Lewis, 1 Colo. App. 127, 27 P. 872, 873; Sinteff v. People’s Building, Loan & Savings Association, 37 App. Div. 340, 57 N. Y. S. 611, 612, affirmed in 166 N. Y. 630, 60 N. E. 1120; Fidelity Building & Loan Association v. Thompson (Tex. Com. App.) 51 S.W.(2d) 578, denying a rehearing (Tex. Com. App.) 45 S.W.(2d) 167, which reversed (Tex. Civ. App.) 25 S.W.(2d) 247; Kelly v. Republic Building & Loan Association (Tex. Civ. App.) 34 S.W.(2d) 924, and Savage v. People’s Building & Loan Association, 45 W. Va. 275, 31 S. E. 991. The ruling in the Holyoke Case is not appropriate here because in that case the right of the withdrawing shareholder, Lewis, was not impaired by statute, but was attempted to be taken away from him by a change in the pertinent az-ticle of the by-laws, by the directors of the association, viz.: “The association declined to return the money, insisting that since the payment by Lewis the directors of the association had repealed the az-ticle of the by-laws referred to, and therefore defendant in error [Lewis] was not entitled to withdraw the money from the association.” Sinteff’s Case, also, was merely an attempt on the part of the board of directors of the association to breach the contract. The only question in the ease was whether the condition printed on the back of Sintell’s stock certificate, “the articles of association, by-laws, terms and conditions, together with the application, are to be construed together as the contract between the shareholder and the association,” included' and made applicable ail subsequent amendments of the articles and by-laws, and, specifically an "amendment which was made after the certificate was issued and which changed the method of paying withdrawals, to the prejudice of the shareholder. The court decided that the conditions printed on the stock certificate did not refer to subsequent amendments of the by-laws, detrimental to' the rights of the shareholder; and, in so deciding, the court' reconciled its decision with the z-uling in Engelhardt v. Fifth Ward Permanent Dime Saving
 
 &
 
 L. Association, 148 N. Y. 281, 42 N. E. 710, 35 L. R. A. 289. The case of Fidelity B. & L. Association v. Thompson was a contest between the borrowing and the noziboz-z-bwing members of an insolvent association ; and the statute which was under con
 
 *968
 
 sideration was held to he invalid in attempting to discriminate against the nonborrowipg members by imposing upon them all of the losses of the association. The decision is not at all relevant to the issue in the present case. The ruling which was made in Kelly’s Case does seem to be in point; but, with great respect for the judgment of the Court of Civil Appeals of Texas, we observe that the Supreme Court of Texas did not have occasion to consider Kelly’s Case. The ruling in Savage v. People’s B. & L. Association, like the ruling in the Holyoke Case and in the Sinteff Case, was merely that the board of directors of the association could not breach the contract with a shareholder by amending the by-laws of the assdeiation.
 

 The plaintiff in this case cites also the decision rendered by the Court of Appeal of Louisiana, for the Second circuit, in Harris v. Monroe Building & Loan Association, 154 So. 508. That case, however, is now pending in this court on a writ of review, which was issued today.
 

 The plaintiff quotes and relies upon an expression in the opinion rendered in State ex rel. Orlando v. Reliance Homestead Association, supra, viz.: “By giving to shareholders the right to withdraw their shares and by prescribing the method by which funds are to be made available for the payment of their claims when their applications to withdraw are filed, the lawmaker gave to them a privilege which cannot be denied them.” The court meant that the privilege could not be denied them (the withdrawing shareholders) by the court, not that it could not be denied them by an act of the Legislature. The case was decided before the Act of 1932 came into effect, and the only question in the case, as stated in the opinion, was whether the association was required by section 7 of the Act of 1902, as amended by the .Act of 1916, to apply one-half of the gross receipts, or only one-half of the net receipts, to the payment of withdrawals when they were in arrears sixty days. Hence the expression in the opinion, which the plaintiff here relies upon, is not at all appropriate to this case.
 

 Counsel for the plaintiff argue that the principle which we have announced as controlling the decision of this case is not applicable because the Act of 1932 vests almost unlimited authority and discretion in the board of directors, in the matter of determining what proportion of the receipts of an association shall be applied to the payment of applications for withdrawal, and what proportion shall be applied to the payment of dividends to continuing members. It is conceded: “Such power might have been granted to a court, to a banking department, to a public board or commission.” But it is contended that such power cannot be granted legally to a board of directors, composed of continuing members of an association, and having, therefore, a personal interest in conflict with that of the withdrawing members, in the matter of appropriating the receipts of the association to the payment of dividends, rather than to the payment of applications for withdrawal. The Legislature, in its judgment, evidently, concluded that there was no great danger of an abuse of the authority which was given to the boards of directors of building and loan associations. The interests of all of
 
 *970
 
 the shareholders, including, of course, the withdrawing shareholders, are protected from abuse of authority on the part of the board of directors, by the fact that the statute has placed all building and loan associations under the supervision and control of the state bank commissioner. We called attention to that in State ex rel. Catonio v. Italo-American Homestead Association, supra. Section 64 of the statute so provides, and requires every building and loan association to make semiannual reports to the commissioner; and section 65 provides: “Twice every year or oftener, if he deems it necessary, the said Commissioner shall make an examination into the affairs of each such association.” And section 67 imposes upon the commissioner the duty of seeing that the officers and directors of building and loan associations perform their duties faithfully; and the same section of the statute empowers the commissioner to enforce his orders in that respect, under penalty of liquidation of the association. Aside from these considerations, a withdrawing member of a building ánd loan association, as we have pointed out, may withdraw his application at any time, and have all of the advantages enjoyed by the other continuing members. Hence there is no unfair discrimination, or denial of the equal protection of the laws in that respect.
 

 Our conclusion is that the plaintiff in this case has no cause or right of action.
 

 The judgment appealed from is annulled and reversed, and the demand of the plaintiff is rejected and his suit dismissed at his cost.
 

 ODOM, J., dissents.